IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,998

STATE OF KANSAS,
*Appellee*,

v.

JEREMY D. LEVY,
*Appellant*.

SYLLABUS BY THE COURT

1.

A person has committed the crime of criminal discharge of a firearm at an occupied motor vehicle under K.S.A. 2020 Supp. 21-6308(a)(1)(B) if: (1) that person recklessly and without authorization discharges a firearm; (2) that discharge was "at a motor vehicle" independent of the shooter's intended target; and (3) a person was inside the vehicle.

2.

Gang affiliation evidence is admissible if it is relevant and there is sufficient evidence that gang membership or activity is related to the crime charged.

3.

A felony-murder jury instruction which states the defendant or another killed the victim does not improperly broaden a charge against the defendant, even if the complaint or information stated the defendant killed the victim.

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Opinion filed April 23, 2021. Affirmed.

1

*Peter Maharry*, of Kansas Appellate Defender Office, was on the briefs for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Jeremy D. Levy was convicted by a jury of first-degree felony murder and received a hard 25 sentence. On appeal, he challenges the sufficiency of the evidence used to convict him; claims the district court erroneously admitted gang evidence; argues his jury instructions impermissibly expanded the charge against him; and suggests cumulative error denied him a fair trial. We find no error and affirm his conviction.

FACTS AND PROCEDURAL BACKGROUND

Erick Vazquez was shot to death as he sat inside his gray Nissan truck in the parking lot of a strip mall in Wichita on June 17, 2017. He was an innocent victim caught in cross-fire between two rival gangs. Jeremy D. Levy was a member of the Folk Gangster Disciples, while three individuals—including KeAndre Summers—were members of the Piru Blood gang. Levy had been getting a haircut at the barbershop in the strip mall when he saw the three Piru Blood members sitting on the tailgate of a white Ford F-150 in the parking lot.

According to the barber, Levy became agitated and said that he did not "get along" with the group outside. After the haircut, Levy left the barbershop and the barber saw him turn right toward some shops further down the strip mall. At that point, the barber saw Summers pull a gun and heard shots ring out from the direction Levy had gone. Summers

2

returned fire, and the three Piru Blood members crouched down using the F-150 as cover. A gun battle ensued until the three Piru Bloods were able to drive off in a white car. After the shooting, the barber went outside to render aid but did not see Levy.

Once police arrived, they found a parked Nissan truck with its engine revving at a high rpm and Vazquez unresponsive in the driver's seat with his foot on the gas. He was declared dead on the scene. Investigators recovered shell casings near the F-150's driver's side door, in the bed, and on the truck bed toolbox. Testing determined two firearms were used in the shooting. The State's theory at trial was that Levy and Summers engaged in a mutual gun battle and Vazquez was an unfortunate bystander. The State relied on eyewitness testimony to establish that both Levy and Summers participated in the gun fight. Levy and Summers were charged in separate criminal cases.

An officer with significant experience with Wichita gangs—Detective Sage Hemmert—testified generally about Wichita gangs and to the rivalries between the Bloods and the Gangster Disciples, or "GD's." According to Detective Hemmert, this feud began in 2008. Detective Hemmert confirmed that Summers and the others with him were "Piru Blood" gang members and identified Levy as a Gangster Disciple. He explained a music video posted to social media intensified tensions. The video, which featured Summers, was filmed by a Piru Blood and included lyrics about "shooting people in the face and the head" and included "several lyrics about sending people to the cemetery"—directed at the GDs.

The State arrested Levy on July 8, 2017, and charged him with felony murder with the underlying felony of criminal discharge of a firearm at an occupied vehicle. At trial, Levy focused on the State's lack of direct forensic evidence tying him to the shooting and attacked Detective Hemmert's gang theory as motivation for the shooting. A jury

3

convicted Levy of first-degree felony murder and Levy received a hard 25 sentence. He directly appeals.

DISCUSSION

On appeal, Levy raises four instances of error. First, he challenges the sufficiency of the evidence used to convict him. Second, he asserts the district court erred when it permitted Detective Hemmert's gang evidence testimony. Third, he alleges the district court impermissibly "broadened the charge" against him. Fourth, he claims cumulative error denied him a fair trial. Finding no error, we affirm the district court.

*Sufficiency of the Evidence*

Levy first attacks his felony-murder conviction by challenging the sufficiency of the evidence to support the underlying crime of criminal discharge of a firearm at an occupied vehicle.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

"Felony murder is the killing of a human being committed 'in the commission of, attempt to commit, or flight from an inherently dangerous felony.'" *State v. Potts*, 304 Kan. 687, 694, 374 P.3d 639 (2016). "Criminal discharge of a firearm is the . . . [r]eckless and unauthorized discharge of any firearm . . . at a motor vehicle . . . in which there is a

4

human being whether the person discharging the firearm knows or has reason to know that there is a human being present." K.S.A. 2020 Supp. 21-6308(a)(1)(B).

Levy claims that the evidence at trial only showed he intended to fire at Summers, *not* at an occupied vehicle. He then argues this evidence is legally insufficient to support a conclusion that he was committing the underlying felony. We begin by assuming Levy's interpretation of what the evidence at trial showed—i.e.*,* that he only intended to shoot Summers—and address his argument concerning legal sufficiency.

Levy acknowledges our decision in *State v. Farmer*, 285 Kan. 541, 175 P.3d 221 (2008), is likely fatal to his position. But he urges us to reconsider *Farmer* and adopt the rationale expressed by Justice Beier in her dissent. In that case we held that the previous iteration of our criminal discharge statute was not a specific intent crime. In other words, the State did not have to prove that the shooter both intended to discharge a firearm and that the shooter intended to shoot the vehicle (as opposed to some other target). We held:

> "The statute was designed to cover situations where there are difficulties in proving the shooter's intent. According to Farmer's, and the dissent's, interpretation of the criminal discharge statute, there *cannot be any* evidence of intent to shoot at anything other than the occupied vehicle or building itself. In other words, there must be a complete absence of intent to hit an occupant of an occupied vehicle or building for the statute to apply. Such a construction eviscerates the criminal discharge statute by putting the focus right back on the shooter's intent, thus making it unavailable in the very situations it was designed to cover-situations where proof of intent to injure or kill is problematic." 285 Kan. at 546-47.

Justice Beier dissented and focused on the statutory language "'at [a] . . . motor vehicle.'" 285 Kan. at 556 (Beier, J., concurring in part and dissenting in part). She concluded this phrase was not ambiguous and incorporated a specific intent element into the crime. In other words, proving a specific intent to shoot at the vehicle itself, rather

5

than some other target, was a necessary element of the crime of criminal discharge. As Justice Beier wrote:

> "[T]here is zero evidence that Farmer shot *at* the vehicle in which DeAundrey Neal happened to be sitting rather than *at* Neal himself. . . .
>
>     . . . .
>
> ". . . The phrase, 'at [a] . . . motor vehicle,' does not look or sound ambiguous to me. Shooting at a motor vehicle is one thing; shooting at a person is something else. Regardless of whether the State's or the defendant's version of events is relied upon here, Farmer shot only at Neal." 285 Kan. at 556 (Beier, J., concurring in part and dissenting in part).

Levy now relies on the rationale of the *Farmer* dissent to claim that because the evidence showed he only intended to shoot at Summers, not at Vazquez' truck, he could not have committed the underlying felony of criminal discharge. We decline Levy's invitation to revisit our *Farmer* holding. In Kansas, the crime of criminal discharge does not require a specific intent to shoot "at a motor vehicle" as opposed to at some other target—whether that target is inside the vehicle, hiding behind the vehicle, or only nearby the vehicle. This conclusion is further supported by the legislative amendments to the criminal discharge statute altering the necessary state of mind to "reckless." Compare K.S.A. 2006 Supp. 21-4219(b) (criminalizing "the malicious, intentional and unauthorized discharge of a firearm") with K.S.A. 2020 Supp. 21-6308(a)(1)(b) (changing the mens rea to "reckless"). Putting all this together, a person has committed the crime of criminal discharge under K.S.A. 2020 Supp. 21-6308(a)(1)(B) if: (1) that person recklessly and without authorization discharges a firearm; (2) that discharge was "at a motor vehicle" independent of the shooter's intended target; and (3) a person was inside the vehicle.

Even under Levy's interpretation of the evidence produced at trial, that evidence was legally sufficient to support the jury's determination that Levy committed the underlying felony of criminal discharge.

*The district court did not abuse its discretion when it admitted Detective Hemmert's testimony.*

At trial, Levy objected to the district court's admission of Detective Hemmert's testimony concerning gang "warfare" in Wichita and Levy's gang affiliation. Levy contends the evidence showed Summers' and Levy's feud was personal—not gang related—and that Detective Hemmert's testimony prejudicially played on the jury's fear of gangs. Levy essentially claimed Detective Hemmert's gang testimony was not relevant and that its prejudicial impact far outweighed its probative value. The district court permitted the testimony, though it gave a limiting instruction.

On appeal, Levy renews his arguments and claims the district court committed reversible error by admitting the testimony and providing an insufficient limiting instruction. Even though Levy recognizes gang evidence is not K.S.A. 60-455 evidence, he believes using gang evidence cast the shadow he was "a general wrongdoer."

The admission of evidence involves several legal considerations: determining relevance; identifying and applying legal principles including rules of evidence; and weighing prejudice against probative value. See *State v. Shadden*, 290 Kan. 803, 817-18, 235 P.3d 436 (2010). We apply various standards of review during this process. First, we consider whether the evidence is relevant. All relevant evidence is admissible unless it is prohibited by statute, constitutional provision, or judicial precedent. See K.S.A. 60-407(f); *Nauheim v. City of Topeka*, 309 Kan. 145, 153, 432 P.3d 647 (2019). K.S.A. 60-401(b) defines relevant evidence as "evidence having any tendency in reason to prove any material fact." See *State v. Lowery*, 308 Kan. 1183, 1226, 427 P.3d 865 (2018).

7

Relevance has two elements: materiality and probativeness. See *State v. Miller*, 308 Kan. 1119, 1167, 427 P.3d 907 (2018). Evidence is material when the fact it supports is in dispute or in issue in the case, and our standard of review for materiality is de novo. 308 Kan. at 1166-67. Evidence is probative if it has any tendency to prove any material fact, and we review a lower court's decision that evidence is probative for abuse of discretion. 308 Kan. at 1166-67. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). A district court may still exclude relevant evidence if it finds its probative value is outweighed by its potential for producing undue prejudice. See K.S.A. 60-445. "Gang affiliation evidence is admissible if relevant." *State v. Peppers*, 294 Kan. 377, Syl. ¶ 1, 276 P.3d 148 (2012). For gang evidence "to be admissible there must be sufficient proof that gang membership or activity is related to the crime charged." 294 Kan. 377, Syl. ¶ 2.

Levy contends his and Summers' animosity was personal, and not due to their gang affiliations. His theory hinges upon a supposed love triangle entangling Levy and DeAdrian Johnson—a member of the Piru Bloods.

Detective Hemmert testified Levy and Summers were members of rival gangs who at the time were warring factions. Hemmert established the Wichita Blood/Folk feud started in 2008 after "a high-profile homicide." Detective Hemmert noted perceived slights by one group could quickly ramp up hostilities for a time. The groups would retaliate for even slight infractions, including disrespect for group members, fights over love-interests, or physical altercations at places like night clubs. These flash points would "spill into three months worth of violence."

Detective Hemmert described rising hostilities from December 2016 to early 2017. Hemmert listed various key players in each group and a chronology of violent altercations, starting in October 2016. The detective's testimony explained how the alleged "love triangle" was enmeshed in the gang rivalry. On March 9, 2017, Brian Collier, a Folk gang member, posted Facebook videos threatening Levy's romantic rival from the Piru Blood gang by name. These threats extended to "all of [his] friends and associates." Detective Hemmert identified "a 17-year old girl"—N.W.—as the video's impetus. Hemmert explained N.W.'s place in the puzzle:

> "[T]here was already animosity between these two groups prior to when this video was produced on New Year's Day of 2017 and the beef about [N.W.] stated in the fall of 2016. So insofar as is there animosity between these two groups which motivates them to make a music video disrespecting the other group and is [N.W.] a part of that animosity? Probably."

The key portion of Detective Hemmert's testimony is as follows:

"Q:  And this theory about [N.W.] being at the center of some sort of triangle between Mr. Levy and [N.W.]—and who was the other young man?

"A:  *DeAdrian Johnson*.

"Q:  DeAdrian Johnson. That's really the only theory is you're here to share with us as an explanation as to why Mr. Vazquez died; is that correct?

. . . .

"A:  That is at the core of this feud. *That's not the only contributing factor by any means to this feud. But the feud between Jeremy* [*Levy*] *and DeAdrian* [*Johnson*]*, yes,* [*N.W.*] *was at the core of that*. Everything that I've learned and throughout the several months of investigation pointed to that." (Emphases added.)

On cross-examination, Detective Hemmert explained N.W.'s relationship had to be viewed in the context of the larger gang conflict:

"Q: Detective Hemmert, there is this for lack of a better word love triangle explanation that you've offered for the jury to consider. Is there any other explanation that would explain what's happened here in terms of another kind of a feud or a different feud?

"A: *When you have the long standing feud that I talked about that goes back to 2008, I mean, that—you have that aspect of it.* You have the music video, Head Shots. You have the fact that Debrylan Bell was in fact murdered by members of this rival group. *You have the* [*N.W.*] *aspect to it.* You also have Shannon Cavitt and Anthony Collins knew each other from several years prior before—I'm talking 2008, 2009, before Anthony Collins went to prison and they don't get along at all now. *So you have some old beefs and problems that all contribute to this feud, but certainly* [*N.W.*] *is the—was the main driving factor between Jeremy* [*Levy*] *and DeAdrian Johnson, which drove this feud in large part.*" (Emphases added.)

The district court did not err when it held Detective Hemmert's gang testimony was relevant. There was significant evidence "that gang membership or activity [was] related to the crime charged." See 294 Kan. 377, Syl. ¶ 2. Hemmert's testimony established a long-standing feud between warring gang factions in Wichita, and these factions often violently retaliated against one another. Absent this explanation, there would be no understandable motivation for the strip mall shooting. The N.W. "love triangle" does not—by itself—explain the animosity between Summers and Levy. A love triangle between N.W., Levy, and Johnson does not explain why Summers and Levy would fire upon each other at first sight. Even Johnson and Summers' friendship fails to explain why Summers and Levy immediately started a gun battle. Only with Detective Hemmert's testimony does the "love triangle" begin to fit into a much bigger puzzle in which Summers' and Levy's animosity becomes clear.

Second, Levy argues even if Detective Hemmert's gang testimony was relevant, its prejudicial effect far outweighed its probative value. Levy contends the jury would make the inferential leap from gang membership to criminality to conviction regardless of the evidence. In *Peppers*, the defendant challenged "this court's previous rulings that admission of gang affiliation evidence is not subject to further analysis—including possible exclusion or limiting instruction—under K.S.A. 60-455 on other crimes and civil wrongs." 294 Kan. at 387. He "argue[d] that jurors naturally associate gang membership with criminal activity, and thus evidence of gang affiliation needs to be treated like other evidence likely to be used by jurors as irrelevant proof of a defendant's general propensity for wrongdoing." 294 Kan. 387-88.

We disagreed, explaining:

"[T]he legislature has demonstrated no inclination to treat gang affiliation evidence in the same way it treats evidence of other crimes and civil wrongs. Although evidence of a defendant's gang affiliation certainly may be prejudicial, so is most evidence sponsored by the State in any criminal trial. If the evidence is nevertheless relevant—*i.e.*, material and probative—and not *unduly* prejudicial, it may be admitted." 294 Kan. at 388.

See *State v. Dean*, 310 Kan. 848, 861-63, 450 P.3d 819 (2019); *State v. Conway,* 284 Kan. 37, 50, 159 P.3d 917 (2007).

In our judgment, the district court did not abuse its discretion in finding Detective Hemmert's testimony not *unduly* prejudicial. In fact, the district court guarded against the potential for undue prejudice by giving the following limiting instruction:

11

"INSTRUCTION NO. 4

"There has been evidence offered tending to prove gang membership and affiliation. The evidence may only be used to show motive, part of the events surrounding the commission of the crime, the relationship of the parties, identification and witness bias. This evidence shall not be considered for any other purpose."

While Levy now claims even that limiting instruction was insufficient, we disagree. Levy points to no caselaw suggesting such a limiting instruction is inadequate. And in fact, we have approved nearly identical limiting instructions in the past. See *Dean*, 310 Kan. at 863 ("[T]he district court mitigated any undue prejudice . . . by instructing the jury that evidence of 'gang membership and affiliation . . . may be used to show motive, part of the events surrounding the commission of the crime, the relationship of the parties, identification, and witness bias' and 'shall not be considered for any other purpose.' As a result, we hold the district court did not err when it admitted evidence of gang affiliation."). We find no error.

*The felony-murder jury instruction was legally appropriate.*

Levy claims the jury instructions used in his trial impermissibly expanded the charge against him. The complaint read "one JEREMY D. LEVY did then and there unlawfully kill a human being." Levy compares this to jury instruction No. 7, which required the State to prove "[t]he defendant *or another* killed Erick E. Vazquez." (Emphasis added.) Levy argues expansion from "Levy" to "Levy *or another*" permitted the jury to convict him "of something he was never charged with" in violation of his due process rights. (Emphasis added.)

"When analyzing jury instruction issues, we follow a three-step process:

'(1) determining whether the appellate court can or should review the issue, i.e., whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, i.e., whether the error can be deemed harmless.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

Whether a party has preserved a jury instruction issue affects the reversibility inquiry. 307 Kan. at 317; see K.S.A. 2020 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). At the second step, we consider whether the instruction was legally and factually appropriate. 307 Kan. at 318. Appellate courts use unlimited review to determine whether an instruction was legally appropriate. *State v. Johnson*, 304 Kan. 924, 931-32, 376 P.3d 70 (2016). To be factually appropriate, there must be sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support the instruction. *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

The issue is preserved for our review—albeit under the less favorable clear error standard because Levy admits he did not object to the instruction below. *State v. Dobbs*, 297 Kan. 1225, 1237, 308 P.3d 1258 (2013). Levy asks us to hold jury instruction No. 7—which described first-degree felony murder—was not legally appropriate. Instruction No. 7 in its entirety read:

"INSTRUCTION NO. 7

"Jeremy D. Levy is charged with murder in the first degree. Jeremy D. Levy pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. The defendant or another killed Erick E. Vazquez.

"2. The killing was done while defendant was committing criminal discharge of a firearm at an occupied motor vehicle.

"3. This act occurred on or about the 17th day of June, 2017, in Sedgwick County, Kansas.

"The elements of criminal discharge at an occupied motor vehicle are as follows:

"1. The defendant discharged a firearm at a motor vehicle.

"2. The defendant did so recklessly and without authority.

"3. The motor vehicle was occupied by a human being at the time, whether or not the defendant knew or had reason to know it was occupied.

"4. This act occurred on or about the 17th day of June, 2017, in Sedgwick County, Kansas.

"Recklessly or Reckless

"A defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that certain circumstances exist."

Levy's argument runs squarely into our settled precedent. In *State v. Robinson*, 308 Kan. 402, Syl. ¶ 3, 421 P.3d 713 (2018), we expressly rejected Levy's argument:

"*The trial court does not improperly broaden a charge when it instructs the jury on the elements of felony murder by stating the defendant or another killed the victim even though the complaint or information stated the defendant killed the victim.* The law considers all who commit an inherently dangerous felony to be a killer if the fatal blow occurs during the commission of, attempt to commit, or flight from any inherently

14

dangerous felony, and the instruction informs the jury a defendant may be guilty whether the defendant or another committed the fatal act." (Emphasis added.)

The State could not definitely show who fatally shot Vazquez because no guns were recovered from the scene. Instead, the State's theory suggested Levy and Summers engaged in a gun battle—with each firing in the direction of Vazquez' truck—and Vazquez died as an unfortunate bystander. So, identifying the person who fired the fatal shot was not necessary—so long as the State showed Vazquez' death occurred as Levy fired at an occupied vehicle. The State presented evidence Vazquez was shot as Levy committed the underlying felony of criminal discharge at an occupied vehicle, so we hold the instruction was legally appropriate.

*Cumulative error did not deny Levy a fair trial.*

Finally, Levy argues cumulative error denied him a fair trial. Because we find no error, the cumulative error doctrine does not apply. *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015); see also *State v. Blansett*, 309 Kan. 401, 402, 435 P.3d 1136 (2019) (explaining that under the cumulative error doctrine, the court must identify "multiple errors to accumulate").

Affirmed.

BEIER, J., not participating.
MICHAEL E. WARD, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Ward was appointed to hear case No. 119,998 vice Justice Beier under the authority vested in the Supreme Court by K.S.A. 20-2616.