NOT DESIGNATED FOR PUBLICATION

No. 124,157

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of L.F.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; JANE A. WILSON, judge. Opinion filed April 15, 2022.
Affirmed.

*J. Shane Rockey*, of Rockey & Stecklein, Chtd., of Kansas City, for appellant natural father.

*Zahi Omari*, assistant district attorney, and *Mark A. Dupree Sr.*, district attorney, for appellee.

Before HURST, P.J., GARDNER, J., and PATRICK D. MCANANY, S.J.

PER CURIAM: Father appeals the district court's termination of his parental rights,
claiming his due process rights were violated by the State's failure to provide him with
earlier personal service of process and the district court's denial of his motion for a
second continuance. While this court recognizes the paramount importance of parental
rights, it also recognizes the rights of children to safety and permanency. Here, the State
met the statutory minimum requirements to ensure Father had notice and opportunity to
prepare and present a defense to the proceedings. Additionally, the district court
considered the best interests of the child and did not abuse its discretion in denying
Father's request for a second continuance of the termination proceedings when such
continuance was not requested to allow him to prepare for trial. In proceedings that affect
the fundamental rights of a parent, the State and courts must ensure that all required due

1

process standards are met and should endeavor to afford the parents with as much notice and time to prepare a defense as possible—and here, the district court met its obligation.

FACTUAL AND PROCEDURAL BACKGROUND

On May 7, 2019, the State sought a temporary custody order for L.F. from the Wyandotte County District Court and requested the court declare her a child in need of care (CINC). The State's petition identified Mother but stated that the identity and whereabouts of Father were unknown. Without any notification to the unknown father, the court granted the State's petition and scheduled an adjudication hearing for July 22, 2019.

The State filed an affidavit on June 12, 2019, explaining its efforts to obtain service on Mother and to identify the unknown father, and requested leave from the district court to obtain service by publication. The State explained that it had no information about the identity of L.F.'s father:

> "The District Attorney's Office has no way of locating the father, John Doe, no information is known about him such as his date of birth, social security number, address, phone number, place of employment, relatives' names etc. John Doe has never contacted any of the professionals involved in this case and has never appeared for any court hearings in this case. We do not know the whereabouts or identity of John Doe."

The district court granted the State's request and approved service by publication, finding "due diligence was exercised and no other means of service is available other than service by publication." The Notice of Publication was printed on June 20 and 27 in the Wyandotte Echo and The Pulse Legal Publication.

About a month after the service by publication, on July 22, 2019, the district court held an adjudication hearing. Neither Father nor Mother were present. After receiving the

State's evidence, the district court found L.F. was (1) without adequate parental care, control, or subsistence; (2) without the care or control necessary for her physical, mental, or emotional health; and (3) had been physically, mentally, or emotionally abused or neglected. The court then adjudicated L.F. as a child in need of care.

Contrary to the State's June 2019 affidavit seeking notice by publication, a case manager later testified that she was aware of Father's identity by mid-May 2019, and that she believed Father was incarcerated in Lansing Correctional Institution but had been unable to find any other information on him. The case manager testified that she attempted to contact Father—sending him six to eight letters at Lansing—but she never received any response. Three months after the State proceeded with service by publication, a court services officer compiled a disposition report, filed on September 18, 2019, that listed Father by name and identified his location as the Lansing Correctional Facility.

On March 17, 2021, about two years after the court found L.F. to be a child in need of care, the State moved to terminate Mother's and Father's parental rights to L.F. The next day, the State filed another affidavit, containing some of the same language from the first affidavit, and attesting that although it had discovered Father's identity—its investigator had been unable to locate him—explaining its efforts:

> "On 03/17/21 the Investigator in the District Attorney's Office checked the Telephone Directory, Legal Department, Jail Screen, and Alert Screen, and provided the CSO with information found regarding possible current addresses for [Mother] and [Father].
>
> "Service will be attempted at the parents' last known addresses and service by publication is being done in case service cannot be perfected at these addresses.
>
> "We do not know the whereabouts of [Father]. The whereabouts of

3

[Mother] have been known to case professionals, however, [Mother] reported in October of 2020 that she was moving from her known address, and she has not provided an updated address since that time. The State is attempting service at this address but requests leave of the Court to publish out of an abundance of caution."

The State again requested notice by publication of the termination hearing.

The court granted the State's request, finding the State had once again exercised due diligence in its attempts to find Father, and notice of the hearing was published on March 25 and April 1, 2021. However, about a month later, the State found out that Father had been taken into custody in Wyandotte County. On May 11, 2021, the State was able to personally serve Father with notice and a summons for the rapidly approaching termination hearing. After the State located Father, a social worker testified that she attempted to contact Father via phone and letters, but never received a response from those attempts. She later testified that social workers had been attempting to find Father's contact information since his release from Lansing—sometime in early 2020—but no one was able to obtain his contact information.

On May 17, 2021, the day of the termination hearing, the court appointed Father an attorney. Father's counsel immediately objected to proceeding because Father had been served less than 10 days before the hearing—a violation of K.S.A. 2020 Supp. 38-2267(b)(2). The court agreed, granted Father a short continuance, and rescheduled Father's termination for the following month. The court proceeded with the hearing as to Mother and putative father of L.F. and a second child, and after finding they were unfit, the court determined that termination of Mother's and putative father's rights was in the best interests of the children.

At the beginning of the rescheduled hearing on June 15, 2021, Father requested another continuance so that he could have time to comply with court orders and

4

potentially reintegrate with L.F. The court denied his request, finding a continuance was not in L.F.'s best interests and that Father would not be prejudiced by proceeding with the termination hearing.

During the termination hearing, one of the social workers explained that Father had not completed any of the case plan tasks, and that she "would not feel comfortable making an estimate" about how long it would take him to do so considering the lack of engagement Father had with L.F. and the current charges he faced in Wyandotte County. Another social worker similarly testified that Father had not completed any court orders in the case. Both social workers agreed that in the 25-month pendency of the case, Father had no contact with L.F., who was six years old at the time of the termination hearing. She concluded that "permanency through adoption" was in the best interests of L.F.

Father testified that he had been incarcerated at the time the State filed its petition in 2019, and the last time he had seen L.F. was when she was two years old. He explained: "I haven't seen my baby since she was two. That's all I know. I haven't seen her, I haven't seen her mom. I don't—I didn't even know if her mom was alive. I don't know. Her mom disappeared. I don't know." Father further explained that he was incarcerated around the time L.F. was born and could not sign the birth certificate and had spent time with L.F. for about six months from when she was about 18 months old to two years old. Father was never L.F.'s primary caregiver and saw her for the last time when he threw her a party for her second birthday. When asked about whether he had made any attempts to see L.F. after he was released in February 2020, Father explained:

> "there was nothing that I could do. I mean, I haven't even talked to the mom the whole
> time that I was in prison, and then when I did get out, the only residence that I knew of,
> her grandmother and her auntie. But from her grandmother, she gave me auntie
> information and they just said that [the Mother] was out of town, so I just didn't—I didn't
> feel like that they were even trying to give me any contact to [Mother]. So, I mean, I just

didn't know, but that was the only contact that I had. I didn't even know that they was in state custody, whatever this shit—shit is. I didn't—I didn't even know."

Father also testified he never received any letters or information from the State or the social workers regarding L.F.: "I wasn't even talking to no one in prison. Nobody ever said nothing to me, so no. No. I did that time alone, didn't nobody nothing, nothing."

Father's attorney argued that the State had failed to sufficiently notify Father of this case. Father was released from incarceration in February 2020 and remained out of custody until May 2021, when, he argues, he could have attempted to work on the case plan and to reintegrate with L.F. But the court disagreed, explaining that there had been "plenty of efforts made to try to reach out to [Father], to find him, to locate him, to contact him and there was never anything done in response." The court found that even though Father may have been unaware of the case, he took no steps towards reaching out to L.F. or Mother during the time he was not incarcerated.

The district court terminated Father's parental rights to L.F., finding he was unfit under K.S.A. 2020 Supp. 38-2269(b)(4), (b)(7), (b)(8), (b)(9) in conjunction with (c)(2), and (c)(3); and was presumed unfit under K.S.A. 2020 Supp. 38-2271(a)(6). Finally, the court determined that termination was in the best interests of L.F. The court summarized these findings in a journal entry of termination of Father's parental rights.

Father appeals.

DISCUSSION

Father argues the State's failure to provide him with adequate notice of the case proceedings and the district court's denial of his request for a second continuance violated his due process rights. Notably, Father does not attack the merits of the district court's

6

decision, so this court's review is limited to these procedural, timing issues—and will not address the propriety of the court's decision.

I.       *The State complied with the minimum notice requirements*.

Father contends the State violated his due process rights by failing to comply with the statutorily mandated process of formally notifying parties to a legal action. Specifically, he argues the State should have attempted service pursuant to K.S.A. 2020 Supp. 38-2237(d), which provides for service of process to incarcerated parents. Father's claims present a question of law over which this court exercises de novo review, looking anew at the facts and law. See *In re Care & Treatment of Sykes*, 303 Kan. 820, 823, 367 P.3d 1244 (2016) (explaining that constitutional due process claims are reviewed de novo). *In re Adoption of B.B.M.*, 290 Kan. 236, 240, 224 P.3d 1168 (2010) (statutory interpretation is a question of law subject to de novo review).

Parents subject to actions to terminate their parental rights have a fundamental and statutory right to service of notice of those legal proceedings, and failure to provide adequate notice is a violation of their due process rights. See K.S.A. 2020 Supp. 38-2235, K.S.A. 2020 Supp. 38-2237; *In re H.C.*, 23 Kan. App. 2d 955, 958, 939 P.2d 937 (1997). This court understands the paramount nature of the State's obligation, particularly in a case such as this when the State seeks to affect the fundamental, cardinal rights of parenthood. Such a proceeding should not be taken lightly, nor without thorough attempts at notification.

Kansas statutes provide for three primary methods of service: (1) personal and residential service, (2) service by return receipt delivery, and (3) first-class mail service. K.S.A. 2020 Supp. 38-2237(a)-(c). Additionally, in the event that a parent is incarcerated:

" [S]ervice shall be made by return receipt delivery to addressee only to both the person in charge of the institution and the confined parent in care of the person in charge of the institution or that person's designee." K.S.A. 2020 Supp. 38-2237(d).

Finally, if service cannot be accomplished in person through the typical methods, Kansas law permits notice of the proceeding to be published in a newspaper of general circulation—so long as the State first exercises due diligence in its attempts to serve the parties in person. K.S.A. 2020 Supp. 38-2237(e). The statute states:

"If service cannot be completed after due diligence using any other method provided in this section, service may be made by publication in accordance with this subsection. Before service by publication, the petitioner, or someone on behalf of the petitioner, shall file an affidavit which shall state the affiant has made an attempt, but unsuccessful, with due diligence to ascertain the names or residences, or both, of the persons. The notice shall be published once a week for two consecutive weeks in the newspaper authorized to publish legal notices in the county where the petition is filed. If a parent cannot be served by other means and due diligence has revealed with substantial certainty that the parent is residing in a particular locality, publication shall also be in a newspaper authorized to publish legal notices in that locality." K.S.A. 2020 Supp. 38-2237(e).

Understandably, service by publication "is a last resort for service on a parent in a termination proceeding." *In re M.H.*, No. 112,378, 2015 WL 3514180, at *4 (Kan. App. 2015) (unpublished opinion). Notice publication in these types of proceedings should be limited—only used when the parent cannot be located after the State's exercise of due diligence. The State's efforts to locate and personally serve parents must be at least as diligent "'as a reasonably prudent person would make in view of the circumstances and must extend to those places where information is likely to be obtained and to those persons who, in the ordinary course of events, would be likely to receive news of or from the absent person.'" *In re H.C.*, 23 Kan. App. 2d. at 959 (quoting *In re L.S.*, 14 Kan. App. 2d 261, 788 P.2d 875 [1990]). The State's failure to exercise due diligence in its pursuit

of identifying the parent's name and address for service is a fatal error, voiding any judgment for lack of personal jurisdiction. See *In re L.S.*, 14 Kan. App. 2d at 263. Although this standard appears stringent, the effort required from the State does vary depending on the case—"[d]ue diligence does not require the use of all conceivable means possible to an inquiry into the absent parent's whereabouts." 14 Kan. App. 2d at 264.

Here, the State's initial CINC petition filed in May 2019 listed Father as "[u]nknown to the State at this time," and explained that "[F]ather's whereabouts and identity are unconfirmed and unknown at this time." The next month, the State filed an affidavit stating it had no information about Father, and it had no way of locating him, and requested permission to serve him by publication pursuant to K.S.A. 2020 Supp. 38-2237(e). Based on the State's assertions, the court found that the State had exercised due diligence in attempting to locate Father and that no means of service other than publication was available. Thereafter, notice of the CINC adjudication hearing was published on June 20 and 27, and the hearing was held in July 2019.

According to the State's affidavits and court filings, it was unaware of Father's identity until September 2019—two months after the CINC hearing—when a court services officer discovered Father's name and the fact that he was incarcerated at Lansing Correctional Facility. How the court services officer located this information when the State alleged it had put forth effort and was unable to make this determination before the CINC adjudication is not clear from the record. However, two years after the CINC adjudication, a case manager testified that she had become aware of Father's identity and the fact that he was incarcerated in Lansing as early as May 2019—just days after she had been assigned the case and before the State requested notice by publication asserting it was unable to identify or locate Father. This social worker further testified that she attempted to contact Father at Lansing—albeit unsuccessfully—in June 2019 by sending several letters introducing herself and explaining the case. Although there was an

9

apparent disconnect between the State and the case managers related to identifying and notifying Father, that does not wholly undermine the State's argument that it complied with its statutory and constitutional notification requirements.

Father was released from Lansing in February 2020, more than six months after the CINC adjudication, and Father made no attempts to contact L.F., the case managers, Mother, or the State regarding L.F.. The State claimed it had no information about his whereabouts after his release. By March 2021, when the State filed its motion to terminate parental rights, it was unquestionably aware of Father's identity, but claims it was unaware of how to locate him. The State unsuccessfully attempted to issue a summons to Father and serve him with a copy of its motion to terminate his parental rights to L.F. by both personal and certified mail service at his last known address.

Although the State is generally required to serve parents with the "motion requesting termination of parental rights," an exception to that obligation exists when the parent cannot be located for the CINC case. See K.S.A. 2020 Supp. 38-2267(a) and (b) (requiring service of termination motions); K.S.A. 2020 Supp. 38-2267(b)(3) (relieving the State of its obligations to serve parents the motion to terminate when the State was unable to locate the parent for the CINC proceeding). Kansas law does "not require additional service to any party or interested party who could not be located by the exercise of due diligence in the initial notice of the filing of a petition for a child in need of care." K.S.A. 2020 Supp. 38-2267(b)(3).

After unsuccessfully trying to personally serve Father with notice of the parental termination proceedings, the State again moved the district court for permission to serve notice by publication, citing attempts to locate Father by the "Telephone Directory, Legal Department, Jail Screen, and Alert Screen, and provided the CSO with information found regarding possible current addresses for [Father]." Again, the court found the State had exercised due diligence in attempting to locate Father and on March 17, 2021, ordered

10

service on Father by publication. Father was arrested in May, about two months after the district court ordered publication service, and the State was able to personally serve him while he was in custody. Therefore, in addition to the prior service by publication, the State also personally served Father with process on May 11, 2021, about a week prior to the scheduled hearing.

At the May 17, 2021 termination hearing the district court granted Father's first request for a continuance, and continued the termination hearing until June 15, 2021. Therefore, in addition to the service by publication, Father received personal service and notice more than 10 days before the termination hearing. See K.S.A. 2020 Supp. 38-2267(b)(2). Because Father received actual, personal notice of the hearing in accordance with statutory requirements—he was apprised of the pendency of the action and afforded an opportunity to present his objections to the action.

Father questions whether the State exercised due diligence in its efforts to locate him sooner, but has not shown that the State failed to make a reasonable and prudent inquiry into the places he may have been and the people who may have had information or news as to his whereabouts. Father contends that he should have received service pursuant to K.S.A. 2020 Supp. 38-2237(d) because he was incarcerated at the time of the CINC adjudication. But the State provided sworn statements that it was unaware of Father's identity during the notification for the CINC adjudication proceedings in June 2019 when he was incarcerated. By the time the State contends it became aware of Father's identity, he was no longer incarcerated. Given the scant information the State had about Father—and his limited connection with Mother, her family, or L.F.—the State's efforts to provide Father notice complied with the applicable statutes and due process guarantees.

Although the State's efforts to identify Father, locate him, and provide personal service may have been less than rigorous given that at least one case manager later

11

testified that she was aware of Father's identity during the CINC proceedings—Father did ultimately receive notice of the termination proceedings via both service by publication and personal service. See K.S.A. 2020 Supp. 38-2237. Father in fact appeared with counsel at the May 17 termination hearing and again at the June 15 termination hearing where he provided testimony and evidence. Father's due process rights were not violated as he was given sufficient notice of the proceedings and an opportunity to be heard to defend against the State's claims. See *In re H.C.*, 23 Kan. App. 2d at 958.

2. *Unlimited continuances are not guaranteed.*

Father also argues that the district court should have granted his request for a second continuance of the termination hearing. District courts are afforded deference in determining if a continuance is appropriate, and this court reviews a district court's refusal to grant a continuance for an abuse of discretion. *In re J.A.H.*, 285 Kan. 375, 384, 172 P.3d 1 (2007). The district court abuses its discretion when it takes a position that no reasonable person would take under the circumstances, or its decision was based on an error of fact or an error of law. *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021).

In cases involving the termination of parental rights, the termination proceeding typically occurs after years of prior proceedings and State involvement through case management. Thus, Kansas law requires that all such proceedings "be disposed of without unnecessary delay," and "[a] continuance shall be granted only if the court finds it is in the best interests of the child" and only when "good cause is shown." K.S.A. 2020 Supp. 38-2267(a); K.S.A. 2020 Supp. 38-2246. The Kansas Supreme Court has explained that "'[i]n ruling on a motion for continuance . . . a court must consider all circumstances, particularly such matters as the applicant's good faith, his showing of diligence, and the timetable of the lawsuit.'" *In re J.A.H.*, 285 Kan. at 385. The district court's denial of Father's request for a second continuance was not accompanied by a lengthy reasoning, but the court heard testimony of Father's failure to contact A.F. for the preceding year

12

when he was no longer incarcerated, efforts to contact Father, and that the case had been pending for over two years. The court explained it considered the best interests of A.F., the need for permanency, and that it did not believe Father would be prejudiced by the denial.

Father argues the district court abused its discretion in denying his second continuance because the State failed to earlier notify him of the case to allow him the opportunity to comply with the court orders and case management plan for reintegration. Although courts have discretion in their decisions to permit a continuance, that discretion is bound by due process requirements that interested parties be afforded an opportunity to present their objections, which includes a reasonable time to prepare a defense to the litigation. *In re H.C.*, 23 Kan. App. 2d at 961*; see In re S.M.*, 12 Kan. App. 2d 255, 256, 738 P.2d 883 (1987). Here, the district court granted Father an initial continuance of almost 30 days. Unlike *In re H.C.*, 23 Kan. App. 2d at 961, where the mother requested a continuance to secure witnesses and records necessary for her defense—here Father requested a second continuance to pursue reintegration—not to prepare a defense. By the time of his request for a second continuance, the case had been pending for 25 months— about a third of L.F.'s life. He never contacted L.F. or the State after his release from incarceration during the pendency of the case, he was not in contact with L.F. while incarcerated, and he was currently incarcerated at the time of his second request. Father's requested continuance would have indefinitely delayed the termination hearing. Kansas courts "must strive to decide these cases in 'child time' rather than 'adult time.'" *In re J.A.H.*, 285 Kan. at 386. A reasonable person could conclude that a second continuance was not in the best interests of L.F., thus the court did not abuse its discretion in deciding not to grant Father's request for a second continuance of the termination hearing.

13

CONCLUSION

The district court's decision to terminate Father's parental rights as to L.F. is affirmed because Father received notice of the proceedings in accordance with his due process rights, and the district court did not abuse its discretion in denying Father's request for a second continuance of the termination hearing.

Affirmed.