NOT DESIGNATED FOR PUBLICATION

No. 124,418

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

THE ESTATE OF DEBRYLAN BELL, by and Through Its Duly Appointed
Administrator BENITA BELL, and BENITA BELL, Heir at Law of DEBRYLAN BELL,
*Appellants*,

v.

617 WEST LLC, VILLAGE PARK APARTMENTS, LLC,
EUCALYPTUS REAL ESTATE, LLC,
CONSOLIDATED CAPITAL INVESTMENTS, LLC, and DOVER GROUP, LLC,
*Appellees*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Opinion filed December 23, 2022. Affirmed.

*Melinda G. Young*, of Melinda Young Law, LLC, of Hutchinson, for appellants.

*Amy S. Lemley* and *Wyatt A. Hoch*, of Foulston Siefkin LLP, of Wichita, and *Scott J. Gunderson*, of Nelson, Gunderson & Lacey, of Wichita, for appellees.

Before GARDNER, P.J., WARNER and COBLE, JJ.

PER CURIAM: There is no generalized duty in Kansas for business owners to protect all people from all possible harms that could occur on business property. But businesses must take steps to protect their guests and customers from reasonably foreseeable dangers. Though foreseeability can be a fact-intensive inquiry, there are rare instances where it can be determined as a matter of law. This wrongful-death case is one such example.

1

Debrylan Bell was killed in the parking lot of a Wichita apartment complex—a targeted "hit" by members of a rival gang. Bell's mother, who is also the administrator of his estate, sued the apartment complex where the crime happened, claiming Bell's death was caused by the complex's negligence—specifically, its failure to take additional steps to ensure the safety of people at the apartments. The district court granted summary judgment to the apartment complex, finding it did not have a legal duty to protect Bell since Bell was engaging in illegal activity and that the killing was not foreseeable.

Bell's estate appeals, asserting the case should have been allowed to go to trial. After carefully reviewing the record and the parties' arguments, we agree that Bell's killing was not foreseeable and that this determination could be made as a matter of law. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of October 5, 2016, rival gang members killed 18-year-old Bell while he sat in a car in the parking lot of the Village Park at Woodgate apartment complex in Wichita. Neither Bell nor his killers lived at the complex, but Bell had been staying there at times over the past few weeks with his friend Zsa Zsa Montgomery, who was a tenant.

*The Events Surrounding the Killing*

Bell had spent the day before his death at Montgomery's apartment and, after dinner, borrowed her car for the night. At some point while out that night, Bell was involved in—or at least present for—some sort of altercation involving the Piru Bloods, a rival gang. Bell, who was linked to the Folk Gangster Disciples, had experienced past altercations with the Bloods and was known to have enemies within that group.

2

Later that night, a car drove around Wichita seemingly looking for Bell. Its occupants were Dennis McGaugh and Terasha Presley-Dupree—who were both associated with the Piru Bloods—and three other women, including a victim of the earlier altercation that night and one of Bell's cousins. McGaugh, who was driving, was wearing a GPS ankle monitor as a result of previous criminal activity; this ankle monitor reported McGaugh's whereabouts to law enforcement. The monitor's GPS tracking system showed that McGaugh went all over the city that night, including by Bell's home and near Bell's girlfriend's home.

Bell's cousin eventually called Bell from the car, asking to meet up and "match a blunt"—meaning, to smoke marijuana. Bell explained that he was on his way back to Montgomery's apartment at Woodgate and they could meet there. He got to Woodgate around 4:15 a.m. and called Montgomery, telling her that he was outside and going to smoke with his cousin.

About 10 minutes later, the car with Bell's cousin, McGaugh, Presley-Dupree, and others entered Woodgate's parking lot. Some of its occupants opened fire on Montgomery's car, killing Bell. McGaugh's GPS data shows that the shooters were at Woodgate for less than three minutes for this encounter.

When Bell was shot, he was sitting in Montgomery's car, which he had parked along the north edge of Woodgate's parking lot next to a fence with a "No Parking Fire Lane" sign. Montgomery regularly parked in that area but had recently gotten cited for it. Bell also regularly parked there, but Montgomery later told police she had recently told him not to.

McGaugh and Presley-Dupree pleaded no contest and were convicted of voluntary manslaughter and criminal discharge of a firearm for Bell's killing. A few months after the shooting, the Piru Bloods released a music video called "Head Shots" in which they

bragged about Bell's killing, escalating the violence between the Bloods and the Folk Gangster Disciples. The Kansas Supreme Court has referenced "Head Shots" and Bell by name when discussing violence between the two gangs in an unrelated case. See *State v. Levy*, 313 Kan. 232, 239, 485 P.3d 605 (2021).

*The Wrongful-Death Action*

In 2018, Bell's estate, through his mother Benita, sued multiple companies involved in Woodgate's ownership and operations (which we refer to collectively as the apartment complex), alleging that they were negligent in providing security. The estate's petition alleged that there had been multiple instances of criminal activity at Woodgate since the current owners—defendant 617 West LLC—bought the complex. These ranged from minor noncriminal complaints, to property crimes, to violent crimes like rape and assault. None of the incidents reported mention gang violence, and it is unclear how the criminal activity at Woodgate compared to surrounding areas or Wichita generally.

The case proceeded to discovery, where the parties exchanged conflicting evidence about gang activity at the Woodgate apartments. A detective investigating Bell's case testified that Woodgate was not a hotbed for gang activity in Wichita. But the detective also noted that he had been to the complex before to look for known gang members. Montgomery testified that there were gang members living at Woodgate when she lived there, including people from rival gangs. People similarly told an investigator for Bell's estate that the complex had a crime problem, including renting to rival gang members. If gang members lived at the complex, however, there was no evidence the complex knew about it.

Information obtained during discovery also showed that before Bell died, Woodgate had some security measures in place. The complex had security cameras around the exterior of the apartments and a sign near the crime scene warning that "this

4

property is protected by video surveillance." The complex also had an unarmed security patrol at night, which it shared with another nearby property. The guards were to observe the properties and report any unusual conduct to management or call the police if anything needed immediate attention. But neither of these measures were in place on the night of Bell's death:

- The camera system was not working that night, though there is no evidence anyone involved in Bell's death knew this.

- There was no guard on duty that night; the guard scheduled to patrol the property was hospitalized, and the complex did not have a replacement.

At the close of discovery, the apartment complex moved for summary judgment, alleging that it had no legal duty to protect Bell against the targeted shooting that led to his death. The estate also requested partial summary judgment, seeking to limit the degree to which the defendants could compare the fault of Bell's killers and others.

The district court held a hearing on the parties' arguments and ultimately granted the apartment complex's motion. The court determined that the only disputed fact—whether the apartment complex rented to known rival gang members—was immaterial. It also found, over the estate's objection, that evidence of Bell's and his killers' gang associations was relevant and admissible.

Turning to the controlling legal issue, the district court found that there were at least two reasons why the apartment complex did not owe a legal duty to safeguard against Bell's killing. First, the court found that Bell was a trespasser at Woodgate when he was killed because he was parked illegally (in a fire lane in the parking lot) and intended to engage in illegal activity (smoking marijuana). Second, even if he was not a trespasser, the court found that Bell's targeted killing was not reasonably foreseeable by

the apartment complex, so the defendants had no duty to prevent it. The court also found that the killing was undeterrable because McGaugh was wearing a GPS monitor at the time, effectively guaranteeing that he would be caught. Thus, there were no steps the apartment complex could have taken to prevent the killing.

The district court thus entered judgment in favor of the apartment complex. Bell's estate appeals.

DISCUSSION

On appeal, Bell's estate challenges both bases for the district court's decision. The estate argues the district court erred in finding that the apartment complex did not owe Bell a duty of reasonable care because he was a trespasser. The estate also asserts that the complex owed Bell a duty to try to prevent his death because it was foreseeable given previous criminal activity at the apartment complex and inadequate security the night of his death. The apartment complex asserts that Bell was a trespasser and that even if he was not, his death was not reasonably foreseeable so the apartment complex had no duty to prevent it.

Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." K.S.A. 2021 Supp. 60-256(c)(2). A party seeking summary judgment must show there are no disputed questions of material fact—that there is nothing the fact-finder could decide that would change the outcome. See *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009). This requires the district court to view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of every reasonable inference drawn from the evidentiary record. 289 Kan. at 900. Because summary judgment tests the legal viability of a claim, we apply this same framework on appeal. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013). "Summary judgment is seldom

6

proper in negligence cases." *Esquivel v. Watters*, 286 Kan. 292, Syl. ¶ 3, 183 P.3d 847 (2008).

To succeed on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a legal duty and breached that duty, and that the plaintiff was injured as a result of the defendant's breach. *Sall v. T's, Inc.*, 281 Kan. 1355, Syl. ¶ 2, 136 P.3d 471 (2006). "Whether a duty exists is a question of law." 281 Kan. 1355, Syl. ¶ 2.

Kansas law does not impose a generalized duty on everyone to prevent all possible harm to others; such a duty would be unwieldy and unworkable. See *Gragg v. Wichita State University*, 261 Kan. 1037, 1045, 934 P.2d 121 (1997). In the same vein, a business is not the insurer of its customers' safety. *Seibert v. Vic Regnier Builders, Inc.*, 253 Kan. 540, 548, 856 P.2d 1332 (1993). A business "ordinarily has no liability for injuries inflicted upon patrons or customers by the criminal acts of third parties in the business' parking lot, as the owner has no duty to provide security." 253 Kan. at 548. But in some cases, Kansas law imposes a duty of care to safeguard against reasonably foreseeable harms based on the circumstances of a particular case and the parties' relationships. See *Gragg*, 261 Kan. at 1045.

Previous cases have found that landowners owe different duties to people with permission to be on the premises—licensees or invitees—and people there unlawfully, who are trespassers. See, e.g., *Wrinkle v. Norman*, 297 Kan. 420, 422, 301 P.3d 312 (2013). These cases determined that a landowner owes someone with permission to be there a duty of reasonable care. 297 Kan. at 422. But when someone is trespassing, the landowner owes only a duty "'to refrain from willfully, wantonly, or recklessly injuring'" the person. 297 Kan. at 422.

The district court here determined that Bell was a trespasser when he was killed and thus that the apartment complex owed him no duty of reasonable care. The court

7

reasoned that although Bell at first had a tenant's permission to be there, he became a trespasser when he arrived at the complex intending to smoke marijuana and then parked in a no-parking area.

But whether someone with permission to be on the premises becomes a trespasser is often a factual determination, especially when, as here, the parties dispute the purpose of the person's presence on the premises. Bell's estate asserts that Bell was at Woodgate lawfully because Montgomery, a tenant, invited him. According to the estate, an unfulfilled intent to smoke marijuana and a minor parking violation do not change his status as a licensee or invitee. But according to the apartment complex, these activities made Bell a trespasser.

At a minimum, this dispute—whether Bell became a trespasser at Woodgate that night—raises factual questions that were inappropriate for resolution at the summary-judgment stage. Thus, the estate is correct that the district court erred when it entered summary judgment for the apartment complex on that basis. But this was not the only rationale supporting the district court's decision.

The district court's alternative basis for its ruling—that the complex owed Bell no duty to prevent his death because it was unforeseeable—was sound. To determine whether a criminal act is foreseeable—and thus whether there is a duty to take steps to prevent it—courts examine the circumstances of the case at hand. *Seibert*, 253 Kan. 540, Syl. ¶ 4. The circumstances considered must "have a direct relationship to the harm incurred," and courts have examined factors like whether there have been similar incidents at the location, whether it is in a high-crime area, and whether the landowner knew about the attacker beforehand. 253 Kan. at 549; see *Gragg*, 261 Kan. at 1054; *Nero v. Kansas State University*, 253 Kan. 567, 584, 861 P.2d 768 (1993). While foreseeability is generally a factual determination, a court may decide it as a matter of law when reasonable people could only arrive at one conclusion. 253 Kan. 567, Syl. ¶ 6.

8

Kansas courts have considered foreseeability in circumstances comparable to this case before. For example, in the *Gragg* case, a woman was shot and killed at a public event on Wichita State University's campus, and her estate sued the university and others for negligence in providing security. But the Kansas Supreme Court found that the defendants owed the victim no duty to protect her from the shooting because it was not foreseeable; there had been no similar incidents at the event in previous years, and none of the defendants knew or had reason to know of the shooter or his intentions. 261 Kan. at 1056-57. And although the neighborhoods surrounding the university had high-crime rates, there were no facts showing that these rates posed security problems in the past such that the defendants should have known more security was necessary at that year's event. 261 Kan. at 1057.

In contrast, our Supreme Court found that a criminal attack may have been foreseeable when a university student was sexually assaulted in a residence hall by another student. *Nero*, 253 Kan. at 569. The perpetrator had been accused of rape shortly before—which the university knew about—yet the university later placed him into another coed dorm with the victim, where the attack happened. On appeal, our Supreme Court determined reasonable people would disagree about whether the attack was foreseeable, so it was a question for the fact-finder, not something that could be resolved on summary judgment. 253 Kan. at 585.

And in *Gardin v. Emporia Hotels, Inc.*, 31 Kan. App. 2d 168, 61 P.3d 732, *rev. denied* 275 Kan. 963 (2003), this court considered similar circumstances when determining that an attack at a motel was unforeseeable. There, a man was stabbed outside the motel lobby, and a motel worker would not let him into the building during the attack. The victim was not a motel guest, but the attacker was. This court determined that the attack was unforeseeable—and thus that the motel owed the victim no duty to

9

prevent it—because there was little evidence of past crimes at the motel, it was not in a high-crime area, and the area of the attack was well lit. 31 Kan. App. 2d at 175-76.

Applying these principles here, Bell's killing was not foreseeable to the apartment complex. Neither Bell nor any of his killers lived there. There had been no prior incidents at the complex involving any of them. And rather than wait for Bell at Woodgate to exploit a lack of a security guard on duty, inoperative cameras, or poor lighting, the killers searched for him around Wichita, and he just happened to be at Woodgate when they found him. Bell's killing was not a crime of opportunity. Rather, the attack's targeted nature suggests that Bell's killers would have shot him anywhere they located him.

Bell's estate points to a long list of incidents reported to police from the apartment complex in the years before Bell's death. These reported incidents increased after the defendants bought the complex and include violent crimes, such as gun crimes and rape, that the estate argues made further crime like Bell's killing foreseeable.

But these incident reports—which include criminal and noncriminal matters—do not demonstrate that the particular crime committed here was reasonably foreseeable. In other words, these previous incidents had no "direct relationship to the harm incurred"—that is, to Bell's targeted killing. See *Seibert*, 253 Kan. at 549. His killers appeared set on tracking Bell down and shooting him wherever they could find him, and the location was irrelevant. The investigating detective testified that the killing was akin to "a hit." The shooters did not rob Bell or take any of his belongings; in under three minutes, they entered the parking lot, shot him, and left. And the Piru Bloods later released a music video—"Head Shots"—bragging about Bell's death. Nothing from the incident reports could have put the apartment complex on notice that a targeted crime like this might happen.

10

Bell's estate attempts to rebut this conclusion by pointing to evidence from a police report showing someone at the complex recalled seeing an argument between several men earlier in the night near the crime scene. The same person noticed two men near a vehicle that matched the general description of the killers' car—a black SUV. The estate suggests that the killers may have been scoping Woodgate as the shooting location because of a lack of security.

But one of Bell's killers, McGaugh, was wearing a GPS ankle monitor when he killed Bell. The monitor's data from that night shows that McGaugh was not at the complex before or after the killing, so whoever the witness saw, it was not McGaugh. And Bell had just returned to the complex when he was killed, so there is no evidence he was involved in the argument either. Further, only one person in the killers' car— McGaugh—was a man. The rest were women, so the group of men arguing and standing by a black SUV earlier that night could not have been Bell's killers.

The estate also suggests that certain security issues—cameras that were not working and no unarmed roving security guard on duty the night of the shooting—made Bell's death foreseeable. But his death resulted from a targeted shooting for which the location was irrelevant. There is no evidence to show that the shooters planned the shooting at the apartment complex in order to benefit from inoperative cameras or lack of a guard; instead, they tracked Bell down after searching for him around Wichita, all while one of them wore a GPS ankle monitor.

Under these circumstances, no reasonable person would find this targeted shooting at the apartment complex reasonably foreseeable. Thus, the apartment complex had no duty that would give rise to a negligence claim. The district court did not err in granting the defendants' motion for summary judgment.

Affirmed.