NOT DESIGNATED FOR PUBLICATION

No. 124,236

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARLON ANDREW FORD,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court, JEFFREY SYRIOS, judge. Opinion filed February 10, 2023. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before ARNOLD-BURGER, C.J., GARDNER and CLINE, JJ.


PER CURIAM:  Marlon Andrew Ford appeals his jury conviction of rape of M.L., raising many issues. He alleges error in the jury instructions, the prosecutor's closing argument, the admission of evidence, and the denial of his motion for a mistrial. He also alleges that the rape statute and the offender registration statute are unconstitutional. After careful review, we affirm his conviction, his sentence, and his KORA registration requirement.

FACTUAL AND PROCEDURAL BACKGROUND

This case presented a credibility determination to the jury. We first review the State's evidence, based largely on the victim's testimony, then review Ford's contrary testimony.

*The State's Evidence*

Ford and M.L. attended the same high school in Kansas City, where Ford was two years ahead of M.L. M.L. knew Ford through her older sister and a friend, but she was not close with him during high school.

In 2015 and 2016, while attending Kansas City Kansas Community College, M.L. began interacting with Ford, mainly electronically by texting and apps, such as Snapchat. During the summer of 2016, M.L. was at her sister's house where Ford showed up drunk (according to M.L.). Ford kissed M.L., but she did not reciprocate. During that encounter Ford "tr[ied] to, like, frisk me, touch me and stuff, but I didn't want that to happen" and nothing else sexual occurred. Still, after this event, M.L. and Ford's acquaintanceship turned into a friendship, but M.L. made it clear to Ford "we were just friends."

Despite M.L.'s insistence to Ford that they were only friends, a year later in the summer of 2017, Ford conveyed to his friend, Keyron Kimbrough, that he was romantically interested in M.L. In fact, Kimbrough's conversation with Ford and Kimbrough's observations of the two together left Kimbrough with the impression that Ford and M.L. were in a romantic relationship.

That same summer, M.L. introduced Ford to her mother before she and Ford went to a restaurant and a movie. Before this outing, M.L. made it clear to Ford that it was not a date, stating Ford knew they were just friends. Undeterred by M.L.'s proclamation, Ford

tried to touch M.L.'s "behind" while out, which prompted her to reiterate "that's not what I want it to be." During the outing, Ford also asked to kiss M.L., but she declined, telling him, "[N]o, this is not a date." Ford made no more advances that evening.

M.L. received a scholarship to attend Wichita State University and was attending the University in the early fall of 2017. M.L. moved to Wichita and into a dormitory on WSU's campus. Her dorm room was set up like an apartment with a common space, consisting of a living room and kitchen, and separate bedrooms and bathrooms for each roommate. One of M.L.'s roommates described it as "a very upscale dorm" that was "meant to simulate apartment life for students." There, M.L. lived with two other young women. Over the course of the academic year at WSU, M.L. became extremely close with her roommates, one of whom was C.M., and they became "basically sisters" by the time of trial. After M.L.'s move to WSU, her communication with Ford dwindled, but they continued to have some contact via phone and apps like Snapchat, sharing "small talk" every so often.

On November 30, 2017, Ford tried to call M.L. three times, but she did not answer. The next evening, Ford contacted M.L. by Snapchat, explaining to her that he was having a difficult time and needed a friend. He also complained that M.L. did not love him. M.L. called Ford at 10:15 p.m. in response to the Snapchat messages, and during their phone call, which lasted 22 minutes and 44 seconds, Ford expressed thoughts of self-harm and suicide. M.L. tried to help Ford talk through his feelings, and she encouraged him to find a purpose in life, such as working at his father's barber shop. Ford asked to see M.L., but she told him it was not a good idea. Ford told M.L. that he was getting on the highway to come to Wichita, but she told him she did not want to see him. For the moment, Ford relented on coming to see M.L., and their conversation ended.

M.L. then watched some Netflix and talked on the phone with her mom from about 10:30 p.m. to 11:10 p.m. Between 10:44 p.m. and 11:03 p.m., M.L. missed four

calls from Ford. Ford also messaged M.L. asking for her address, which she did not provide. But M.L. had previously shared the name of her WSU dorm with Ford by a screenshot of an email when she told him about her scholarship and her excitement to be living in her top choice of dorm.

At 10:45 p.m., Ford messaged M.L. that he was on his way to her and at 11:04 p.m. Ford texted he was on the highway. M.L. did not immediately respond to Ford because she did not notice the message until after she got off the phone with her mom. When M.L. noticed the missed calls and the texts, she felt Ford was not listening to her so she called him at 11:09 p.m. and told him, "Do not come," "You were not invited," and "Whatever you want to talk about we can talk on the phone." Ford responded, "Okay," but again told her, "You don't love me." This phone call lasted about 90 seconds.

After this brief call, M.L. went to bed and fell asleep. Around 2:48 a.m. on December 2nd, M.L. awoke to use the restroom. While awake, she checked her phone and saw that between 2:14 a.m. and 2:47 a.m. she had over a dozen missed calls and four texts from Ford. These text messages read:

- "Headed yo way"
- "I'm on the highway now"
- "I just drove 3 hrs to sleep in the car bro"
- "Thanks for the flunkie mission dude"

Upset, M.L. called Ford to confront him at 2:48 a.m. Ford told M.L. that he was hurt and sad, and she told him she could not help him and to work on himself and pray. During the call, Ford pressed M.L. to let him inside her dorm but she resisted because he was not invited and she had to wake up at 6:30 a.m. to teach an ACT prep class. Yet Ford continued to pressure M.L. to let him in, and she ultimately let Ford enter a side entrance near the lot she parked in. She took Ford up to her dorm suite and into her bedroom. M.L. did not like Ford's being there uninvited or coming to her room, but she let him in

4

because Ford did not want to sleep in his car and wanted to talk face to face, and they were friends so she wanted to try to talk to him.

Once in her bedroom, M.L. sat on her bed and Ford sat on her desk chair. Before sitting down, Ford took off his hat and headphones and placed them on M.L.'s desk, along with some change. They talked a while longer, and then Ford asked for a kiss. M.L. declined. Ford eventually pressed further and asked M.L., "We fucking[?]"M.L. told Ford, "No," and reminded him that she did not want a sexual relationship with him. Ford "laughed it off and played it off, like he knew, like okay." The two continued talking about Ford's struggles and path in life until M.L. fell asleep in her shirt and pants. She "drifted off" "propped up" in her bed, sort of leaning back on a lounge pillow that had a big back and then skinny arms coming off either side, with her legs out in front of her.

M.L. awoke to find Ford on top of her. He was naked and had pulled her down to be lying flat. Ford had pinned her legs under his and was holding her hands down with his hands, one on each side of her head, "so [she] couldn't move." M.L. wiggled to resist Ford, which prompted him to lay his weight down on her. M.L. is 5'2" tall and weighs about 110 pounds. Ford is 5'10" and weighs about 150 pounds.

M.L. told Ford, "No," and "this ain't right," but Ford continued and did not respond. Ford then forcefully pinned both of M.L.'s arms to the bed above her head with one of his, and he pulled her shirt up. Ford pressed his face to her lips as she tried to again tell him to stop, and he licked her face, neck, and breasts. Ford then spread her legs and pulled M.L.'s pants and underwear down to "right above [her] knees." Ford told her, calmly, "I'm going to fuck you." M.L. continued to tell Ford that this was not right and to stop as she tried to move away, yet he told her again, repeatedly, "I'm going to fuck you." M.L. was unable to say much more during the attack, but she remembers seeking the look on Ford's face like he was enjoying it.

Ford then put his penis in M.L.'s vagina. M.L. cried as Ford repeatedly thrusted inside her for about a minute and she thought to herself "this [has] to stop." M.L. managed to get one of her hands free and hit Ford in the head as hard as she could with a closed fist, causing him to fall off balance and onto the bed. M.L. tried to get out of her bed and managed to turn her back to Ford, but he pulled her down on top of himself and again penetrated her vagina with his penis from behind.

In another attempt to make the attack stop, M.L. threw herself out of the bed. She began heading to her bathroom, which is connected to her bedroom, pulling up her pants and yelling at Ford to "get out." Before she made it to the bathroom, Ford brushed past her into the bathroom with ejaculate in his hands. M.L. saw him wipe his legs and hands off with tissues.

M.L. recalls Ford moving slowly as she tried to get him out of her room while throwing his clothes at him, hitting him, and yelling at him to leave. M.L. eventually got him out of her room, into the common space, and towards the suite's exit. As Ford was leaving, he turned to M.L. and told her, "Don't talk about it" or "Don't tell anyone."

M.L. returned to her bedroom and found small specks of blood on her bed. Moments later, around 5:30 a.m., she heard a knock on the dorm suite's door. M.L. did not answer the door, but got a text from Ford, reading "My keys to[o]." M.L. retrieved Ford's keys, barely cracked the suite's door, tossed the keys out to him, and told him not to knock and that she was going to call the police.

M.L. went back to her room and sat on her bed in denial "trying to tell [her]self, like, it didn't happen, nothing happened." She stayed awake the rest of the early morning, crying. Eventually, she went to her bathroom and took off her pants and saw "blood everywhere." So she went and sat in her shower yet does not remember showering.

After she left the shower, she got dressed and went to work to teach the ACT prep course, still in denial. She testified, "I kept telling myself that it didn't happen, it didn't happen, it didn't happen until I received a text message from [Ford] that reassured me that something did happen bad." At 8:54 a.m., Ford texted her, "Yo I apologize [three sad face emojis] you know I love uuu [M.L.]" Over the course of the morning, Ford sent M.L. four more texts:

- "Please don't throw away my hat and watch. Just beat my ass and throw"
- "them at me next time you see me."
- "Mail it to me"
- "Just hold on to it till uu don't hate the thought of me"

Seeing these messages prompted M.L. to run to the bathroom and cry.

After M.L's work ended at noon, she returned to her dorm. Knowing that something "bad" had happened to her, but unsure if it was rape, M.L. decided to watch episodes about rape cases on Netflix. She was drawn to this content because "I knew something had happened but I wasn't—I didn't want [*sic*] to be sure. You just don't want to think that that happened to you."

After watching Netflix, she decided to tell someone about the night before, so she told her roommate, C.M. At that point, she and C.M. were not very close, but she happened to be in the suite at the time. So M.L. walked in "awkwardly" and started asking her hypothetical questions, such as "what if this and this happened?"; "[I]f someone was assaulted what would you do?"; "[W]hat do you think somebody should do in this situation if they were hurt, harmed sexually?" Eventually, M.L. began to share bits of what had happened the night before. C.M. testified M.L. cried as she told her she had been "assaulted," and only used the word "rape" once. C.M. persuaded M.L. to let her take her to the emergency room for a rape kit.

C.M. drove a very tearful M.L. to the hospital where M.L. met with a forensic nurse at around 11:30 p.m. M.L. cried during the meeting and stated she did not want the incident reported. M.L. recounted the events with the nurse for about 40 minutes and told her that Ford had used fingers inside her and had laid on her bed next to her before she fell asleep before the attack.

The nurse's genital exam began at 1:25 p.m. on December 3, 2017, during which the nurse noted "copious amounts of blood" coming from a sizable laceration on M.L.'s labia minora. The nurse testified that a laceration is caused by "blunt force." A doctor was consulted about closing the laceration, but ultimately no sutures were placed. The nurse concluded that M.L.'s injury tracked her history of the event.

Swabs from M.L.'s breasts revealed the presence of saliva on both, and a mixture of at least two individual's DNA was found on both breasts. One sample of DNA belonged to M.L. and the other belonged to a male. Ford's known sample was compared to the DNA found on M.L.'s breasts and the odds of selecting another unrelated person at random whose DNA would have matched the saliva found on M.L.'s left breast was one in 1.37 nonillion and on her right breast was one in 29 octillion. For context, the nurse testified "[y]ou have hundreds and then thousands, million, billion, trillion, quadrillion, quintillion, sextillion, septillion, octillion, and then nonillion."

M.L. waited until December 8, 2017, to report the attack to police. She first retold the events to WSU Police Officer Matthew Rose and gave another recounting of the event to WSU Police Detective Jeffery Rider on December 12. M.L.'s statements to police differed from her trial testimony in two respects. First, M.L. told Officer Rose and Detective Rider that she had washed her sheets, but she testified at trial that she had thrown them away. Second, she told Officer Rose that Ford had blood on himself when cleaning up after, but in her statement to Detective Rider and her trial testimony she mentioned no blood on Ford.

Officer Rose recovered Ford's hat, watch, carabiner, and change from M.L.'s room. Detective Rider photographed the suite and M.L.'s bedroom and bathroom. With help from the Kansas Turnpike Authority, Detective Rider determined Ford entered the turnpike in Bonner Springs, at around 11:15 p.m. on December 1, 2017, and then exited the turnpike at K-96 highway in Wichita at around 2:13 a.m. on December 2, 2017.

Detective Rider and the Kansas City Kansas Police Department located Ford in Kansas City. The officers told Ford that they were looking into an incident that happened in Wichita about a week or so ago, and Ford's only comment was "why, what did she say?"

After his contact with law enforcement, Ford sent M.L. several text messages on December 21. Although the texts are collectively subject to interpretation, in one text Ford suggests he would tell authorities that M.L. was on top of him, kissed him, and initiated the sexual intercourse.

*Ford's Evidence*

Ford stated that he had known M.L. since high school and that she had shared pictures of her nipple piercings with him in 2015. Ford agreed that he and M.L. were never boyfriend and girlfriend, although they had sexual interactions in the summer of 2017. During that summer the two "got to . . . third base," which he described as "kissing and fondling" and "touching . . . each other's sex organ" with his pants down and hers "half-way down." The two had also made out at M.L.'s sister's house, where he rubbed his penis on her vagina but stopped short of intercourse.

Turning to the events in early December 2017, Ford testified that M.L. invited him to Wichita for the weekend, but he admitted that he had brought nothing with him on his

9

trip. Ford acknowledged that he placed over a dozen phone calls and sent several frustrated tests to M.L. after he arrived at her dorm parking lot.

After M.L. let Ford into her room, he took off his hat and watch. He and M.L. kissed, he helped her remove her leggings, and then things reached "third base," with the two touching each other's genitals. "[O]ne thing led to another" and M.L. asked Ford if he had a condom. Ford retrieved the one condom he had brought with him, and the two began to have consensual intercourse. The intercourse then stopped, although Ford could not recall how, and the two then cuddled—"spoon[ed]"—on her bed. Ford testified he removed the condom while spooning. Later, Ford denied using the condom during this act and classified it as an act of "sexual intention" but not intercourse.

Ford and M.L. eventually began kissing again and he got on top of her and started kissing her breasts again, then he inserted his penis in her vagina. But after 25-60 seconds, M.L. "abruptly stopped" the sex and became upset with Ford, telling him "that's all [he] wanted." He stopped all sexual activity and denied ejaculating. M.L. asked him to leave, so he complied, forgetting items in her room because she was rushing him out. He retrieved his keys from M.L. when she threw them at him in the hall. Ford texted M.L. later, apologizing about "the fight."

On rebuttal, M.L. admitted that she had shared pictures of surgical scars on her breasts from fibroadenoma tumor removals on social media and on FaceTime calls. Those pictures also showed her pierced nipples. She did so to raise awareness of the disease and to rebuild her body confidence. M.L. also testified that her tumor removals caused her Post Traumatic Stress Disorder (PTSD), but the district court judge admonished the jury to disregard that testimony.

10

After M.L.'s rebuttal testimony, the jury instructions, closing arguments, and questions from the jury, the district court read back both M.L.'s and Ford's testimonies to the jury, as they requested. The jury convicted Ford of one count of rape, as charged.

The district court denied Ford's posttrial motions for a new trial, judgment of acquittal, and arrest of judgment. Denying Ford's motion for a dispositional and durational departure, the court sentenced Ford to 155 months' imprisonment and imposed lifetime postrelease sex offender registration.

Ford timely appeals, raising multiple issues.

I.      DID THE DISTRICT COURT ERRONEOUSLY INSTRUCT THE JURY?

Ford raises two issues with the jury instructions the district court gave. First, he argues the rape instruction was legally insufficient and inaccurately stated the law. Second, he argues the district court should have given the jury his requested sympathy instruction.

A.      *Standard of Review*

When analyzing jury instruction issues, appellate courts follow a three-step process: (1) determining whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, in other words, whether the error can be considered harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). See K.S.A. 2021 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury

11

retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous.").

At the second step, appellate courts consider whether the instruction was legally and factually appropriate, using an unlimited standard of review of the entire record. *Holley*, 313 Kan. at 254. In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. 313 Kan. at 255.

Whether a party has preserved a jury instruction issue affects the appellate court's reversibility inquiry at the third step. 313 Kan. at 254. When a party fails to object to a jury instruction before the district court, an appellate court reviews the instruction to determine whether it was clearly erroneous. K.S.A. 2021 Supp. 22-3414(3). If the challenging party preserved the issue below, an appellate court applies one of two harmless error tests. If the instructional error impacts a constitutional right, an appellate court assesses whether the error was harmless under the federal constitutional harmless error standard—whether there was no reasonable possibility that the error contributed to the verdict. When no constitutional right is impacted, an appellate court assesses whether there is no reasonable probability the error affected the trial's outcome in light of the entire record. 313 Kan. at 256-57.

B.      *Rape Jury Instruction*

Ford argues the district court should have given a "modified *Bunyard* instruction." See *State v. Bunyard*, 281 Kan. 392, 408-16, 133 P.3d 14 (2006), *disapproved of by State v. Flynn*, 299 Kan. 1052, 329 P.3d 429 (2014). *Bunyard* and *Flynn* are rape cases in which evidence showed consent was withdrawn post-penetration. See *Flynn*, 299 Kan. at 1068; *Bunyard*, 281 Kan. at 395. Those cases teach that "when evidence is presented

involving post-penetration withdrawal of consent, the trial court must do more than simply instruct the jury on the statutory elements of rape." *Flynn*, 299 Kan. at 1067. Instead, the district court should give a modified *Bunyard* instruction, which provides that "rape may occur even though consent was given to the initial penetration, but only if the consent is withdrawn, that withdrawal is communicated to the defendant, and the sexual intercourse continues when the victim is overcome by force or fear." 299 Kan. at 1067.

1. *Preservation*

Before we reach the merits of Ford's argument, we must first address a procedural matter—the State's claim that Ford never requested a modified *Bunyard* instruction. Our record on appeal contains no copy of Ford's proposed jury instructions. So we are left to review the oral arguments to the district court during the instructions conference. The transcript reveals that Ford did not argue that M.L. withdrew consent post-penetration or that the court should give a *Bunyard* or *Flynn* instruction.

Rather, counsel objected on two other grounds. First, counsel objected to this language in jury instruction No. 3: "It is not a defense that Marlon Ford did not know or have reason to know that MGL did not consent to the sexual intercourse, or was overcome by force or fear." Ford argued that this did not apply here and would confuse the jury, stating "how can you commit a knowing act without knowing the facts and circumstances?" But the challenged language comes from K.S.A. 2021 Supp. 21-5503(e), which states "it shall not be a defense that the offender did not know or have reason to know that the victim did not consent to the sexual intercourse [or] that the victim was overcome by force or fear." Counsel's argument fails to request a *Bunyard* instruction.

Second, counsel wanted to add language that sexual penetration alone cannot be the force required to satisfy the force element of rape. But Ford's counsel did not orally request an instruction dealing with the withdrawal of consent after sexual intercourse

13

began—the instruction Ford now complains the district court should have given. Nor was any argument made during the instruction conference that M.L. had withdrawn consent post-penetration. True, Ford's counsel did discuss *Bunyard* and *Flynn* in the instruction conference, but only to show that the physical act of penetration was not enough to satisfy the force or fear element of rape. His discussion of those cases ended with this summary:

> "I think that it's very clear from all of the case law that the force that's required has to be something more than the sex act itself. I think in a case like this where force is an issue that it's appropriate to add language letting the jury know that the force has to be something above and beyond the sex act itself."

The district court overruled Ford's objection, holding that the statute was not overly broad and that the challenged language came directly from the statute. The court found sufficient evidence of force independent of the penetration and gave the rape elements instruction as originally proposed.

Nothing in the instruction conference equates to a request for a modified *Bunyard* instruction. Compare *Flynn*, 299 Kan. at 1068 (finding counsel sufficiently requested the instruction when he suggested the potential need for a "withdrawal instruction"). We will thus review any error in the failure to give the instruction for clear error. K.S.A. 2021 Supp. 22-3414(3).

## 2. *No Clear Error*

We assume, without finding, that a modified *Bunyard* instruction was both legally and factually appropriate, so the district court erred in not giving it. The crucial question is thus whether not giving the instruction error was reversible error. To determine this we consider the degree of resulting prejudice. Because Ford did not request the modified

14

*Bunyard* instruction, the error must be clearly erroneous to warrant reversal of Ford's conviction, as explained above. Ford, as the party claiming clear error, has the burden to show it. The clear error standard sets a high threshold or level of certainty as to whether the error affected the outcome. *Berkstresser*, 316 Kan. 597, 605, 520 P.3d 718 (2022). Having determined the district court should have instructed on the withdrawal of consent, we ask not whether a jury *could have* reasonably acquitted the defendant of the charged offense had the jury been properly instructed, but whether the jury *would have* acquitted the defendant without the instructional error. *Berkstresser*, 316 Kan. at 605-06. ("'[C]ould is used to talk about something that can happen, [and] would is used to talk about something that will happen in an imagined situation.' Garner's Modern American Usage, p. 869."). The clear error standard bars a conviction's reversal unless the reviewing court determines the jury "'would have reached a different verdict.'" *State v. Valdez*, 316 Kan. 1, 6, 512 P.3d 1125 (2022). In other words, an instructional error is clearly erroneous when "the court is firmly convinced that the jury would have reached a different verdict if the instruction error had not occurred." *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021). We cannot dilute the applicable test for prejudice, thus giving insufficient deference to the jury's verdict.

Yet Ford's initial appeal brief does not argue clear error. Rather, he argues that we should apply a constitutionally harmless error standard, or if not, the statutory harmless error standard. But clear error is "a heightened standard of harmlessness." *State v. Carter*, 305 Kan. 139, 159, 380 P.3d 189 (2016). Ford fails to recognize that the harmless error scale is finely graduated and that harmless error does not equate to clear error. Still, Ford's reply brief argues clear error, claiming the jury was confused as to the elements of rape, as shown by its request during deliberations for a statutory definition of rape. Ford further asserts that had the jury received the modified *Bunyard* instruction it would have acquitted Ford because evidence showed that M.L. consented and Ford stopped as soon as M.L. withdrew her consent. We disagree with that conclusion for two reasons.

15

First, the facts here are unlike those in *Flynn*, when the court reversed the defendant's conviction for failure to give the modified *Bunyard* instruction. In *Flynn*, sexual intercourse continued for "'30 seconds, a minute, maybe two,'" after consent was withdrawn. 299 Kan. at 1056. According to Ford, sexual intercourse began consensually and then immediately stopped when M.L. withdrew her consent. So under the rape elements instruction that the district court gave the jury, had the jury credited Ford's version of events, it would have acquitted Ford even without a modified *Bunyard* instruction. This is because the jury was instructed that rape requires "Knowingly engaging in sexual intercourse with a victim *who does not consent* to the sexual intercourse . . . [w]hen the victim is overcome by force or fear." (Emphasis added.) K.S.A. 2021 Supp. 21-5503(a)(2). According to Ford, no portion of the sexual intercourse was nonconsensual because he stopped immediately upon withdrawal of consent. If the jury had credited Ford's testimony, it would have found that M.L. initially consented to intercourse and Ford stopped immediately when she withdrew consent, so it would have acquitted Ford under the rape elements instruction that required the jury to find that M.L. did not consent. Thus, Ford fails to convince us that the jury would have reached a different verdict on the felony conviction without the instructional error.

Second, the facts of the case show the "he said, she said" battle so common in sexual assault cases—a battle in which credibility and corroboration are crucial. *State v. White*, 60 Kan. App. 2d 458, 480, 494 P.3d 248 (2021), *aff'd*, 316 Kan. 208, 514 P.3d 368 (2022). See *State v. Boysaw*, 309 Kan. 526, 534, 439 P.3d 909 (2019). Recognizing this, Ford claims that the failure to give the modified *Bunyard* instruction deprived him of the opportunity for the jury to believe him and acquit him—reasoning that because he stopped immediately after M.L. withdrew her consent, he was not guilty of rape under *Bunyard* and *Flynn*. But under the Kansas Supreme Court's recent teaching about clear error in *Berkstresser*, we likely cannot find clear error in any case in which a jury's verdict may be based on credibility. The determination of M.L's and Ford's credibility was left to the jury, and we will not disturb that determination on appeal. *State v.*

16

*Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). And because the jury could have disbelieved Ford even if the district court had given a modified *Bunyard* instruction, we cannot be firmly convinced that the jury would have reached a different verdict if the instruction error had not occurred, as the clear error standard requires.

In any event, under all the circumstances, this court is not firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. But even had Ford preserved the issue and we applied the standard for constitutional error that Ford urges, our result would be the same—we find beyond a reasonable doubt, in light of the entire record, that the instructional error did not affect the outcome of the trial. *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011).

C.      *Sympathy Jury Instruction*

Ford also argues that the unusual circumstances of the case coupled with M.L.'s "emotional outburst" at trial warranted a no-sympathy jury instruction.

1. *Additional Facts and Preservation*

At trial, Ford's attorney requested the "sympathy instruction, that the jury is to decide the case without sympathy for or prejudice against any party," as PIK used for many years. That instruction stated:  "You must consider this case without favoritism or sympathy for or against either party. Neither sympathy nor prejudice should influence you." PIK Crim. 3d 51.07 (2000 Supp.). But PIK no longer recommends giving a no-sympathy instruction. See PIK Crim. 4th 51.010-51.220.

Ford argued the instruction was appropriate for two reasons. First, during voir dire "there was talk about consequences and so it may soften that a little bit." This argument is not discussed on appeal, so we do not consider it. *State v. Gallegos*, 313 Kan. 262, 277,

17

485 P.3d 622 (2021) (holding issue not briefed is waived or abandoned). Second, Ford argued to the district court, as on appeal, that M.L.'s emotions during the trial warranted a no-sympathy jury instruction. The State opposed the instruction, asserting that other instructions were sufficient.

The district court denied the requested jury instruction. It relied on the comment to the instruction in the former version of the PIK that the instruction was disapproved for general use and should be given only "under very unusual factual circumstances." After reviewing the emotions M.L. displayed here and the "inherent" emotions of a rape case, the district court judge stated that this case did not present "an unusual factual circumstance," although it was "not a standard rape case" either. Thus the district court declined to give the requested no-sympathy instruction. Ford thus preserved the issue for our review.

2. *Analysis*

We next review Ford's requested, but denied, instruction for legal appropriateness. *Holley*, 313 Kan. at 253. The requested no-sympathy instruction can be legally appropriate at times. *State v. Williams*, 299 Kan. 1039, 1044, 329 P.3d 420 (2014). But such an instruction should not be used "except under very unusual circumstances." 299 Kan. 1039, Syl. ¶ 1. That said, such an instruction is not prohibited and is thus legally appropriate. See 299 Kan. at 1044.

To be factually appropriate, Ford's case must present "very unusual circumstances" warranting the requested jury instruction. We thus ask whether sufficient evidence, viewed in the light most favorable to Ford, would have supported the instruction. 299 Kan. at 1043. The facts, viewed in that light, show:

- during her testimony, M.L. cried a few times;

- after her testimony, M.L. started wailing loudly when leaving the stand and going to the waiting area;
- during Ford's testimony, M.L. sat on the back wall crying silently at times; and
- during defense counsel's closing argument, M.L. began crying and was then escorted out of the courtroom.

Our review of comparable cases shows that these circumstances are not unusual enough to warrant a no-sympathy instruction. For example, in *State v. Holmes*, 278 Kan. 603, 102 P.3d 406 (2004), one or two members of the murder victim's family began crying and were escorted out of the courtroom. The district court denied Holmes' request for a no-sympathy instruction, and the Kansas Supreme Court affirmed that decision, holding the incidents of crying were brief. 278 Kan. at 635-36.

Similarly, in *State v. Filbert*, No. 117,326, 2018 WL 2375261, at *1-3 (Kan. App. 2018) (unpublished opinion), *rev. dismissed as improvidently granted* 311 Kan. 1047 (2020), Filbert was convicted of two counts of rape of his half-sister under 14 years old. The acts involved vaginal, oral, and anal sex. During their testimonies both the defendant and the victim cried on the witness stand, and both needed a pause to regain composure. Still, the panel held that the denial of the requested no-sympathy instruction was proper because "some crying on the witness stand is not an unusual experience during trial" based on the panel's experience. 2018 WL 2375261, at *3.

Other examples may be less factually similar, but they illustrate that even awful facts fail to constitute "very unusual circumstances" warranting the requested jury instruction. See, e.g., *State v. Baker*, 281 Kan. 997, 1004-05, 135 P.3d 1098 (2006) (upholding refusal to give sympathy instruction despite paraplegic, possibly depressed victim); *State v. Reser*, 244 Kan. 306, 316-17, 767 P.2d 1277 (1989) (finding a no-sympathy jury instruction unnecessary when defendant/stepfather was convicted of multiple counts of rape and sodomy against his 14-year-old stepdaughter, noting circumstances were not unusual in criminal courts); *State v. Sully*, 219 Kan. 222, 226,

19

547 P.2d 344 (1976) (finding a no-sympathy jury instruction unnecessary even though multiple photos depicting victim's bullet wounds were shown to jury); *State v. Church*, No. 118,311, 2019 WL 3210222, at *3 (Kan. App. 2019) (unpublished opinion) (finding that lack of a no-sympathy instruction was not clearly erroneous when defendant's then 10-year-old rape victim, who was 6 or 7 years old at time of the assault, testified while holding onto stuffed animal that she called her "'worry eater'").

Ford argues that *State v. Killingsworth*, No. 121,173, 2021 WL 762081 (Kan. App.), *rev. denied* 314 Kan. 857 (2021) supports his argument. Killingsworth argued that his jury should have received a no-sympathy instruction because his victim attended the trial. The panel disagreed, holding "[t]here is nothing unusual about a victim attending a trial. There is no indication in the record that [the victim] had any emotional outbursts or otherwise drew unwarranted attention to herself." 2021 WL 762081, at *5. Ford reasons that here, to the contrary, the record shows that M.L. had an emotional outburst when she left the stand, and he is correct. But *Killingsworth* does not hold that every emotional outburst at trial is unusual. Rather, as the above-discussed cases show, merely crying or showing emotion does not require a no-sympathy instruction. See *Filbert*, 2018 WL 2375261, at *1-3.

The cases underscore that a no-sympathy instruction was not needed here to curb the passions or sympathies of the jury. Here, as in *Church*, "[t]o find that this case presents a sufficiently unique factual scenario warranting use of the no-sympathy instruction would ignore the regularity of this awful but prevalent situation." 2019 WL 3210222, at *4. We find no "very unusual circumstances" showing the need for a no-sympathy jury instruction.

But even if the instruction were factually appropriate, the failure to give it was harmless under the standard for nonconstitutional errors for two reasons. First, when M.L. began crying during defense counsel's closing argument and was escorted out of the

20

courtroom—her last show of emotion—defense counsel immediately argued: "Folks, you can't let sympathy enter into this." The requested no-sympathy instruction would have said the same. Counsel's statement to the jury cured any error. See *Filbert*, 2018 WL 2375261, at *2-3 (holding any error harmless in failure to give no-sympathy jury instruction when prosecutor told jury during closing arguments "We're not to use emotion or sympathy in our deliberations").

Second, viewing the jury instructions as a whole, other instructions adequately addressed the sympathy issue. See *State v. Overstreet*, 288 Kan. 1, 10, 200 P.3d 427 (2009) (holding appellate courts must "consider the jury instructions as a whole and not isolate any one instruction in reaching a conclusion about the instruction's propriety"). Instruction No. 1 told the jury to "consider and weigh everything admitted into evidence. This includes testimony of witnesses, admissions or stipulations of the parties, and any admitted exhibits. You must disregard any testimony or exhibit which I did not admit into evidence." PIK Crim. 4th 50.050 (2012). Instruction No. 2 told the jury to consider the "weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified." PIK Crim. 4th 51.060 (2020 Supp.). Instruction No. 5 also told the jury: "Your verdict must be founded entirely upon the evidence admitted and the law as given [to you] in these instructions." PIK Crim. 4th 67.050 (2012). These instructions told the jury to reach a verdict based on the evidence, not upon extraneous personal considerations such as sympathy. See *State v. Rhone*, 219 Kan. 542, 545, 548 P.2d 752 (1976). In fact, our research has found no case in which a Kansas appellate court has found error when a district court has refused to give a no-sympathy jury instruction. See *State v. Redmon*, No. 113,145, 2016 WL 5344034, at *11 (Kan. App. 2016) (unpublished opinion). We thus find any error in the district court's denial of Ford's request for a no-sympathy jury instruction to be harmless.

## II. DID PROSECUTORIAL ERROR OCCUR DURING THE STATE'S CLOSING ARGUMENT?

Ford next argues that the prosecutor erred during the State's closing argument by (1) eliminating the "force" element of rape; (2) misstating facts; and (3) diluting the burden of proof.

### A. *Standard of Review*

Kansas appellate courts use a two-step process to evaluate claims of prosecutorial error. First, we review claims for error. Second, if we find error, we determine whether the error is prejudicial. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Under the second step, we consider the error harmless "where there is no reasonable possibility that the error contributed to the verdict." 305 Kan. at 109. See also *State v. Fraire*, 312 Kan. 786, 791-92, 481 P.3d 129 (2021).

### B. *Elimination of the "Force" Element of Rape*

First, Ford argues the prosecutor's statements during closing argument eliminated the force element of rape. He claims the prosecution's statements regarding force were legally erroneous and eroded the definition of force. Ford complains of the State's entire closing argument on force, both in its chief argument and in its rebuttal.

The prosecutor argued that Ford used force by pinning M.L's arms above her head, pressing his face against hers, pulling down her pants, and restricting her movements in bed. But in addition, the prosecutor said:

- Ford's "force didn't start in [M.L.'s] bedroom. [It] started when he left the Kansas City area against her wishes . . . . That's him exerting force over her decision-making ability."

- "He calls her phone over a dozen times . . . those early morning hours . . . of December 2nd. That's, again, evidence of Marlon Ford exerting force over [M.L.]"
- "He continues to exert his force when he asks if they can have sex. She says no. He doesn't stop there. He doesn't let it go."

Prosecutors have wide latitude to discuss evidence and "'to craft arguments that include reasonable inferences to be drawn from the evidence,'" but these arguments must be made in a manner that does not offend the defendant's constitutional right to a fair trial. *State v. Banks*, 306 Kan. 854, 862, 397 P.3d 1195 (2017). Ford asserts the prosecution's statements essentially eliminated the force element of rape by diluting it beyond the standard definition of force, which was a misstatement of the law. A prosecutor falls outside the wide latitude afforded the State in conducting its case, thus committing error, by misstating the law. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021).

Contrary to Ford's assertions, our cases show no standard definition of force in the context of rape. "[F]orce is a widely used and readily comprehensible term that does not require a definition. See *State v. Norris*, 226 Kan. 90, 95, 595 P.2d 1110 (1979) (term which is widely used and which is readily comprehensible need not have a defining instruction)." *Bunyard*, 281 Kan. at 420 (McFarland, C.J., concurring in part and dissenting in part).

Rather, the force necessary to overcome the victim of rape is a "highly subjective concept" that does not lend "itself to definition as a matter of law." *State v. Chaney*, 269 Kan. 10, 20, 5 P.3d 492 (2000). The focus is on the victim's perception of being overcome by force. See *State v. Borthwick*, 255 Kan. 899, 914, 880 P.2d 1261 (1994). In *Borthwick*, 255 Kan. at 914, the Kansas Supreme Court held that the force necessary for a rape conviction does not require physical restraint:

"The 'force' required to sustain a rape conviction in this state does not require that a rape victim resist to the point of becoming the victim of other crimes such as battery or aggravated assault. . . . It does not require that a victim be physically overcome by force in the form of a beating or physical restraint. It requires only a finding that she did not give her consent and that *the victim was overcome* by force or fear to facilitate the sexual intercourse."

Ford fails to recognize that appellate courts have resisted defining this subjective element of force in this context. See *State v. Tully*, 293 Kan. 176, Syl. ¶ 12, 262 P.3d 314 (2011).

Ford's argument also reads the word "force" in isolation. Yet the statute requires that a victim be "*overcome* by force." K.S.A. 2017 Supp. 21-5503(a)(1)(A). (Emphasis added.) The Kansas Supreme Court has found that "overcome" means "'to get the better of'" and "'to affect or influence so strongly as to make physically helpless or emotionally distraught.'" *State v. Brooks*, 298 Kan. 672, 691, 317 P.3d 54 (2014) (quoting from Webster's Third New International Dictionary 1607 [1993]). In other words, "overcome" is synonymous with the terms overpower, conquer, and subdue. 298 Kan. at 691; see *State v. Van Nice*, No. 123,316, 2022 WL 881750, at *4 (Kan. App. 2022) (unpublished opinion). For these reasons, Kansas law requires only the amount of force necessary to overcome the victim's will. *State v. Borthwick*, 255 Kan. 899, 914, 880 P.2d 1261 (1994).

For example, pushing the victim's legs apart without her consent is sufficient evidence of force. *Tully*, 293 Kan. at 197-98; *Borthwick*, 255 Kan. at 911; see also *State v. Wyler*, No. 102,336, 2011 WL 2039731, at *11 (Kan. App.) (unpublished opinion) (finding sufficient evidence of force when defendant "got on top of her and had sex with her. She did not consent to this, but she did not physically resist because she was exhausted"); *State v. Barnhart*, No. 99,849, 2009 WL 2371012, at *6 (Kan. App. 2009) (unpublished opinion) (finding sufficient evidence of force in victim "being pushed back on a bed, having her face covered with a pillow, and having her pants pulled down").

Taking the prosecutor's argument in context, we find she did not misstate the law about force. Taken out of context, simply driving to Wichita or repeatedly contacting someone may not show force, yet Ford's actions that night collectively show an escalation of force or a consistent pattern of his affirmative actions to overcome M.L.'s will. See *Borthwick*, 255 Kan. at 914. The evidence that the jury credited was that M.L. did not invite Ford to Wichita, she was angry he was incessantly contacting her in the middle of the night after he arrived outside her dorm, he pressured her to be let inside, she let him into her dorm because the two were friends and he was troubled, she refused his request for sex, and then, after falling asleep, she awoke to find him on top of her, naked. This was an escalation of pressure—a pattern of actions to overcome her will— that the State demonstrated through its argument.

This is force even under the definition Ford offers:  "Power, violence, or pressure directed against a person or thing." Black's Law Dictionary 787 (11th ed. 2019). The portions of the closing argument Ford challenges do not argue that intercourse by itself is enough to show the "force" required for rape. Rather, they described a pattern of pressure directed against M.L. leading to the rape.

Ford also challenges this portion of the rebuttal argument:

"Additionally, even the defendant's own statement is clear that he knew he lacked consent, because what does he tell you? Even if you were to believe his version of events, the defendant said [M.L.] did not want to have sex without a condom. And what did he tell you he did? He violated her rule, her rule that she had for her body.

"She was not going to have sex, according to him, without a condom. And what does he do? After he decides he's going to have sex with her and he knows he doesn't have a condom available, he has her clothes removed, pulls her pants down. Because he said it started with her pants on. He has her pants removed, gets her into position where, again, he can force himself on her, and he said he entered her vagina with his penis

25

without a condom on. Even that, ladies and gentlemen, if you believe that version of events, that is still rape."

Contrary to Ford's argument, this was not an argument that the only force required was the act of intercourse itself. Rather, the prosecutor was emphasizing that even under Ford's own testimony, he removed M.L.'s clothes, positioned her, climbed on top of her, and penetrated her without a condom, knowing that she did not want to have sex without one. Positioning the victim is enough to satisfy the force element of rape. See *Tully*, 293 Kan. at 197-98. And merely being on top of M.L. was enough to satisfy the force requirement, let alone holding her hands, pressing his face against hers, and pulling down her pants. See *Wyler*, 2011 WL 2039731, at *11; *Barnhart*, 2009 WL 2371012. We thus find no prosecutorial error in the State's arguments about force.

C.     *Misstated Facts*

Second, Ford complains that the prosecution misstated facts during closing argument. It is error for a prosecutor to argue "a fact or factual inferences with no evidentiary foundation." *State v. Moore*, 311 Kan. 1019, 1040, 469 P.3d 648 (2020).

Ford points out three alleged factual misstatements in the State's closing argument. First, he targets the language in the rebuttal argument above about M.L.'s alleged "condom rule." But Ford admitted in his testimony that he and M.L. had talked before about sex and that he knew M.L. wanted him to wear a condom if they ever were to have sex. The State's characterization of Ford's testimony about M.L.'s alleged "condom rule" thus did not misstate the facts or make an inference without evidentiary support.

Second, Ford argues that the State's statement that Ford "has her clothes removed, pulls her pants down" erroneously implies that Ford was the only one removing M.L.'s clothing. He claims that his testimony showed that M.L. cooperated in removing her

26

leggings and fully participated in the sexual activities until she withdrew her consent, at which point he stopped.

But the State need not fully credit Ford's testimony while ignoring M.L.'s. M.L. testified that Ford removed her pants and underwear. And even under the version of events most favorable to Ford, he testified he "helped her" remove her pants. Evidence in the record supports the State's version of events described in its closing argument.

Third, Ford complains of the prosecutor's statement that on December 3, 2017, M.L. went to the emergency room "because she knows that at some point she's going to report it. At least she thinks she's going to report it at some point, but it's a difficult decision to make." Ford argues that M.L. did not go to the emergency room because she thought she would report the crime. Rather, he argues, when she went there she did not intend to report the incident and decided to do so only after watching documentaries about rape. True, M.L. did testify that she waited to report the rape because she was in disbelief about what happened to her. Yet right after the incident, when Ford came back for his keys M.L. told him that she was going to call the police. And M.L. had spoken with C.M. about the possibility of involving the police before going to the emergency room for the rape kit. The prosecutor's statements were accurate. We find no prosecutorial error based on a misstatement of fact.

D.    *Dilution of the Burden of Proof*

Finally, Ford argues that the State diluted its burden of proof by misstating the law about his presumption of innocence. Ford challenges this language:

> "Ladies and gentlemen, you have an instruction that tells you it is for you to determine
> the weight and credit to be given to each witness. Now, the defendant, yes, during the
> course of the presentation of evidence in this trial enjoys the presumption of innocence,
> but he is not presumed credible. You are the one who makes that decision. You look at

his statement, you look at his testimony, and you determine and you weigh it and you judge it just as harshly as you would any other witness who testified during the course of this trial."

Ford relies on *State v. Decker*, 288 Kan. 306, 202 P.3d 669 (2009) where Decker was convicted of felony murder in the death of his six-month-old daughter. On appeal, Decker argued that the prosecutor committed misconduct by stating:

"'They [*sic*] saying that [the baby's mother] shook the baby when? She shook the baby that night while she's in there feeding her putting her to bed, is that what they want you to believe? They are saying that there's a reasonable doubt about that, that you don't know who did it. Well, you do when you look at all the evidence. And another thing is *he's no longer presumed innocent*. Case is in. Evidence is in. At this point, based on everything that we've proved, he's guilty.' (Emphasis added.)" 288 Kan. at 314.

The Kansas Supreme Court determined that the prosecutor's statement that the defendant was no longer presumed innocent "was an unequivocally false and erroneous statement of law concerning a basic principle of criminal jurisprudence." *Decker*, 288 Kan. at 315. Although the court had "no problem with a prosecutor arguing that the State's evidence has *overcome* the presumption of innocence," the State's evidence does not terminate the presumption altogether. 288 Kan. at 315. The court found that a rational juror could have easily interpreted the challenged statement "to mean that once the evidentiary portion of the trial is complete, the presumption of innocence no longer applies." 288 Kan. at 315. The court however concluded that the statement, although outside the latitude allowed prosecutors, was not reversible, but merely harmless, error. 288 Kan. at 316.

But Ford's case is unlike *Decker*. The prosecutor here said the defendant enjoyed the presumption of innocence, and merely explained how the jury was to assess Ford's credibility, which is permissible. See *State v. Sprague*, 303 Kan. 418, 428-29, 362 P.3d

838 (2015). Moreover, "[t]he prosecutor's comment must be evaluated in context and can be mitigated by jury instructions regarding the burden of proof." *State v. Peppers*, 294 Kan. 377, 397, 276 P.3d 148 (2012). The jury instructions here fully explained Ford's presumption of innocence, stating:

> "The State has the burden to prove Marlon Ford is guilty. Marlon Ford is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty."

We find that the prosecutor's statement, taken in context, accurately stated the law. Ford's claims of prosecutorial error thus fail.

III. ARE K.S.A. 21-5503(a)(1)(A) AND (e) UNCONSTITUTIONALLY VAGUE?

Ford next contends that K.S.A. 2017 Supp. 21-5503(a)(1)(A) and (e) are unconstitutionally vague, both facially and as applied, because they give no guidance on what constitutes the force or fear necessary to sustain a rape conviction. The State argues that the rape statute is constitutional (both facially and as applied) because persons of ordinary intelligence need not guess at the meaning of force or fear.

Whether a statute is unconstitutionally vague is a question of law subject to our unlimited review on appeal. Appellate courts presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. Courts must interpret a statute in a way that makes it constitutional if any reasonable construction would maintain the Legislature's apparent intent. *State v. Gonzalez*, 307 Kan. 575, 579, 412 P.3d 968 (2018).

Ford argued this point earlier and the district court held that the rape statute was not unconstitutionally vague. We thus find the issue preserved. Yet for the reasons discussed below we find Ford's challenges to these statutes meritless.

29

K.S.A. 2017 Supp. 21-5503 defines rape and precludes certain defenses to that crime:

"(a) Rape is:

"(1) Knowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse under any of the following circumstances:

"(A) When the victim is overcome by force or fear

. . . .

"(e) . . . it shall not be a defense that the offender did not know or have reason to know that the victim did not consent to the sexual intercourse, that the victim was overcome by force or fear, or that the victim was unconscious or physically powerless."

In *State v. Bollinger*, 302 Kan. 309, 318, 352 P.3d 1003 (2015), the Kanas Supreme Court reviewed when a statute is unconstitutionally vague:

"A statute is unconstitutionally vague if it fails to give adequate warning of the proscribed conduct, that is to say, that it '"fails to provide a person of ordinary intelligence fair notice of what is prohibited."' A statute is also unconstitutionally vague if it fails to protect against arbitrary enforcement. Violation of either aspect of these predictability requirements is grounds for invalidating a statute. [Citations omitted.]"

We apply this test when a statute is challenged as facially unconstitutionally vague:

"whether its language conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice. A statute which either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application is violative of due process." *State v. Cantrell*, 234 Kan. 426, Syl. ¶ 11, 673 P.2d 1147 (1983).

The test is the same whether the challenge is facial or as applied. "At its heart the test for vagueness is a commonsense determination of fundamental fairness." *State v. Kirby*, 222 Kan. 1, 4, 563 P.2d 408 (1977).

Ford argues that the subjectiveness of the rape statute makes it unconstitutional on its face because the statute gives no guidance on what constitutes force or fear. We disagree. The rape statute is not unconstitutionally vague simply because an element of the crime is subjective, when the jury assesses the reasonableness of that subjective belief. Cf. *Borthwick*, 255 Kan. at 913-14 ("[F]ear is inherently subjective. Under Kansas law, when a victim testifies that she was overcome by fear, and her testimony is not 'so incredible as to defy belief,' there is sufficient evidence to present the ultimate determination to the factfinder. The reasonableness of a particular victim's fear may affect the jury's assessment of the victim's credibility in arriving at its verdict. [Citation omitted.]"). The Kansas Supreme Court has consistently held the "force or fear" element necessary for rape is a subjective question of fact. See *Brooks*, 298 Kan. at 688 ("[W]e refuse to qualify the term fear and instead note that fear is an inherently subjective concept because . . . '[w]hat renders one person immobilized by fear may not frighten another at all.' As a result, whether a victim is overcome by fear for purposes of K.S.A. 2005 Supp. 21-3502[a][1][A] is generally a question to be resolved by the finder of fact."); *Tully*, 293 Kan. 176, Syl. ¶ 12 ("Force or fear within the definition of rape is a highly subjective concept that does not lend itself to definition as a matter of law."); *Borthwick*, 255 Kan. at 913 ("[F]ear is inherently subjective.").

The Kansas Supreme Court has rejected facial challenges to the force or fear section of the rape statute, even considering fear's subjective nature. In *Cantrell*, 234 Kan. at 435, the defendant alleged that "without requiring instructions that defendant was aware of the victim's resistance and intended to engage in intercourse despite that resistance, men of ordinary intelligence might well differ as to the meaning and application of the acts prohibited by" the rape statute. The court quickly concluded that

the rape statute "is clear, readily understandable by persons of common intelligence and as such was constitutional." 234 Kan. at 435. Similarly, in *State v. Lile*, 237 Kan. 210, 212, 699 P.2d 456 (1985), the Kansas Supreme Court rejected the defendant's claim that what one "perceives to be consensual intercourse but what in fact may be rape because of an undisclosed fear on the part of his sex partner" made the rape statute vague or overbroad, reasoning that rape simply does not apply to "consenting adults."

In fact, under K.S.A. 2021 Supp. 21-5503(e), there is no room for ambiguity in the perception of force or fear because it no longer matters if the defendant does not know if his or her victim is overcome by force or fear: "it shall not be a defense that the offender did not know or have reason to know . . . that the victim was overcome by force or fear." This subsection arguably renders rape a strict liability crime in certain situations. See *State v. Thomas*, 313 Kan. 660, 664, 488 P.3d 517 (2021) (accepting that assumption and finding that rape statute needs no mens rea element). But in *Thomas*, the Kansas Supreme Court found that it was not unconstitutional for the Legislature to adopt strict liability criminal offenses, even for a crime such as rape that carries a potentially lengthy sentence, and that the same rape statute Ford challenges here did not violate the defendant's constitutional due process rights. 313 Kan. at 662-63.

Persons of ordinary intelligence need not guess at the meaning of "force or fear" as used in the rape statute. Rather, as the State argues, persons must ensure that the consent of each sexual partner is free and voluntary. Consent to intercourse free of force or fear—the plain language of the statute—is understood by persons of ordinary intelligence.

Under this same logic, the statute is free from arbitrary and unreasonable enforcement. The statute always requires consent, free from force or fear. The subjective nature of "force or fear" does not invite arbitrary enforcement by police, prosecutors, judges, or juries, by focusing on the victim, whose testimony, if any, is credited or discredited by the jury as the factfinder. And the State must still prove every element of

the crime, including the victim's lack of consent and that the victim was overcome by force or fear.

For similar reasons, Ford's as-applied challenge to the statute fails. Ford's conduct after the events reveals that he understood the intercourse was nonconsensual—he told M.L. not to tell anyone; he apologized; and he sent texts to M.L. revealing his intent to tell a different story to law enforcement. His defense at trial also shows he understood the rape statute as it applied to him, because his version of events presented a lack of "force or fear," yet the jury did not find that version credible. This credibility finding does not render the rape statute unconstitutional as applied to Ford. See *Ward*, 292 Kan. 541, Syl. ¶ 12 ("The weighing of a witness' credibility is solely within the province of the jury. An appellate court does not reweigh evidence, assess the credibility of a witness, or resolve conflicting evidence."). K.S.A. 21-5503(a)(1)(A) and (e) are not unconstitutionally vague, either facially or as applied to Ford.

IV.    DID THE DISTRICT COURT IMPROPERLY ADMIT EVIDENCE OF M.L.'S PRE-RAPE PTSD DIAGNOSIS?

Ford argues the district court improperly admitted evidence of M.L.'s pre-rape PTSD diagnosis because it was irrelevant and created sympathy for her. The State argues that this issue is not properly preserved for review and alternatively, that the evidence was properly admitted.

During Ford's direct examination, Ford testified that M.L. had shared photos of her pierced nipples with him. After Ford's testimony, the State called M.L. in rebuttal. She testified that she had shared pictures of her breasts on social media and on FaceTime— not just to Ford. She did so for two reasons:  to bolster her self-confidence after a tumor removal; and to spread awareness of her aliment—fibroadenoma. On cross-examination

M.L. agreed that the piercings were not part of the medical treatment for her fibroadenoma.

On redirect, the State asked M.L. if she had ever been diagnosed with PTSD, to which Ford objected—after M.L. answered affirmatively—as beyond the scope of cross-examination. The district court overruled this objection. After brief questioning Ford again objected to the PTSD evidence as irrelevant but the district court again overruled the objection. On cross-examination, M.L. testified that the piercings were for herself and were unrelated to the tumors. M.L. testified that she had PTSD because of the removal of her tumors; she had shared the pictures of her scars, which also depicted her piercings, on social media two years before the rape to try to raise her body confidence and to raise awareness for fibroadenoma.

Later, Ford moved for a mistrial based in part on the admission of this PTSD evidence. The district court denied Ford's motion but admonished the jury not to consider any PTSD evidence. The district court found no fundamental failure in the proceedings but admonished the jury out of caution "to remove any possible effect of what may be prejudicial but is probably not."

We assume that Ford properly preserved this issue for appeal and that the evidence was improperly admitted because the PTSD diagnosis was irrelevant. Still, we find any error was cured by the district court's admonishment to the jury to disregard the evidence. The general rule is that an admonition to the jury normally cures the prejudice from an improper admission of evidence. *State v. Huffmier*, 297 Kan. 306, 316, 301 P.3d 669 (2013); *State v. Gleason*, 277 Kan. 624, 642, 88 P.3d 218 (2004). Further, appellate courts presume that "juries follow a court's instructions." *State v. Kleypas*, 305 Kan. 224, 279, 382 P.3d 373 (2016). We do so here and find the admission harmless under the standard for nonconstitutional errors. We find no reasonable probability that Ford would have been acquitted of rape, but for the error. *Ward*, 292 Kan. at 565.

34

V.       DID THE DISTRICT COURT ERR BY DENYING FORD'S MOTION FOR A MISTRIAL?

Ford argues the district court abused its discretion by twice failing to declare a mistrial:  once after admitting evidence of M.L.'s PTSD diagnosis; and once when the jury asked during deliberations about resolving the case when one juror did not agree to the verdict.

We review a district court's decision in denying a motion for a mistrial for an abuse of discretion. *Ward*, 292 Kan. at 550. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021).

A trial court may declare a mistrial because "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-3423(l)(c). When determining whether the declaration of a mistrial is necessary, the trial court first determines whether there is some fundamental failure in the proceeding. If so, the trial court must assess whether it is possible to continue the trial without injustice. The trial court must determine whether the damaging effect can be removed or mitigated by admonition or instruction to the jury. If not, the trial court must determine whether the degree of prejudice causes an injustice and, if so, declare a mistrial. *Ward*, 292 Kan. at 550.

A.       *Motion for Mistrial Based on Admission of PTSD Evidence*

Ford claims that the erroneous admission of evidence of M.L.'s PTSD, as discussed above, warranted a mistrial. But no evidence suggested that M.L. had PTSD as a result of the rape. To the contrary, Ford's counsel clarified that M.L.'s PTSD followed her tumors, and both pre-existed the rape. So we do not fully understand Ford's concern.

35

This is largely because Ford cites only K.S.A. 22-3423(1)(c) (stating that incurable prejudicial conduct to either party may be grounds for mistrial) and fails to discuss how there was a fundamental failure in the proceeding. We find that Ford inadequately briefed this issue so we consider it waived or abandoned. See *Gallegos*, 313 Kan. at 277 (holding issues not adequately briefed are considered waived or abandoned).

B.      *Motion for Mistrial Based on Hung Jury*

More facts will provide context before we address Ford's argument that the hung jury warranted a mistrial. At 5 p.m. the judge sent his aide to tell the jury he was going to send them home for the day. The jury asked for 10 more minutes and the judge agreed. But after about 10 minutes, the jury sent this note: "All but one have reached the same verdict. How do we resolve this?" The parties disagreed as to the meaning of the note. The State argued that given the lateness of the hour and the circumstances preceding the note, it could mean that one juror wanted more time to reach a verdict. Defense counsel, however, argued that it meant that every juror had reached a verdict but the jury was not unanimous, so he requested a mistrial based on a hung jury. When the court was considering its response, the jury asked whether it could review Ford's and M.L.'s testimonies, indicating it desired further deliberations. So the court proposed to answer both jury questions. Its response to the first question was, "If you are unable to reach a unanimous verdict, the Court will declare a hung jury and order a mistrial". It answered the second question by saying, "Yes, it will take time to prepare the transcripts. We will resume deliberations tomorrow." It then sent the jury home for the day.

Before the court brought in the jury to answer their questions, Ford's counsel expressed that he was "fine" with the court's approach. Still, the court asked for clarification, "Any problem with that?" And Ford's counsel replied, "Having my mistrial overruled, no problem." The court clarified that it felt it needed to answer the jury's question about unanimity rather than just declare a mistrial, to which defense counsel

36

said, "Right." Based on this record, Ford tacitly withdrew his motion for a mistrial. The jury was continuing to deliberate and ask questions, and the court was working with the parties to answer all the jury's questions. Thus, the request for a mistrial was not preserved. See *State v. Stanley*, 312 Kan. 557, 561, 478 P.3d 324 (2020) (failure to maintain timely and specific request for mistrial does not preserve matter for review).

And Ford provides meager argument on this issue. He cites one case and K.S.A. 22-3423(1)(d) (stating court may order a mistrial because jury is unable to agree on verdict). Yet Ford again fails to argue how there was a fundamental failure in the proceedings. Nor is the record clear that the jury was hung when it sent its note. We find that Ford did not adequately brief this issue so we consider it waived or abandoned. *Gallegos*, 313 Kan. at 277.

## VI. DID CUMULATIVE ERROR DEPRIVE FORD OF A FAIR TRIAL?

Ford next argues that cumulative error deprived him of a fair trial.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establishes that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional, the party benefitting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022).

But the cumulative error rule does not apply if there are no errors or only a single error. *Gallegos*, 313 Kan. at 277. And we have found only a single error during Ford's

37

trial—an instruction error which was not clearly erroneous. Thus, the cumulative error rule does not apply. See 313 Kan. at 277. Ford's conviction stands.

## VII. DOES KORA VIOLATE THE FIRST AMENDMENT'S PROTECTION AGAINST COMPELLED SPEECH?

Finally, Ford argues that the Kansas Offender Registration Act (KORA), K.S.A. 2017 Supp. 22-4902 and K.S.A. 2017 Supp. 22-4906(b)(1), is facially unconstitutional because it violates his protection against compelled speech in the First Amendment to the United States Constitution. The State argues that this issue is not preserved, and, alternatively, KORA is not unconstitutional because the KORA website is government speech and not individual speech.

At sentencing, the district court told Ford about his duty to register under KORA, and Ford did not object. Ford concedes that he did not raise this issue to the district court. Generally, issues not raised before the district court cannot be raised on appeal. See *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022). Ford invokes two exceptions to that rule: (1) his new theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case and (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights. *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021). But Ford does little to show these exceptions apply here.

Even though Ford recites exceptions, we need not review his new claim. The decision to review an unpreserved claim under an exception is a prudential one. *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017); *State v. Frye*, 294 Kan. 364, 369, 277 P.3d 1091 (2012). So even if an exception would support a decision to review a new claim, we have no obligation to do so. *Parry*, 305 Kan. at 1192. Here, as in *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020), this panel would have benefitted from a full

38

factual development and the district court's analysis of this important constitutional argument that Ford failed to raise. We thus decline to reach the merits of his new compelled speech argument.

Finding no reversible error, we uphold Ford's conviction, sentence, and KORA registration requirement.

Affirmed.